**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Christine Tuma, | ) | |
| | ) | Case No. 1:24-cv-8307 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Jury Trial Demanded |
| | ) | |
| Hawthorne Race Course, Inc., Jim Miller, | ) | |
| John Walsh, Dave White, Illinois Racing Board, | ) | |
| Dawn Folker-Calderon, Beth Buechler, | ) | |
| Thomas Kelley, and John Eddy | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AMENDED COMPLAINT AT LAW

Plaintiff, Dr. Christine Tuma, through her attorneys, the Garfinkel Group, LLC complains against Defendants Hawthorne Race Course, Inc., the Illinois Racing Board, Jim Miller, John Walsh, Dave White, Dawn Folker-Calderon, Beth Buechler, Thomas Kelley, and John Eddy for civil violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961-2, 1964, the Illinois Whistleblower Act, 740 ILCS 174/1 *et seq.*, and the Illinois torts of retaliatory discharge and civil conspiracy.

### SUMMARY

1.      Beginning on or before March of 2022, Defendants Hawthorne Race Course, Inc. ("Hawthorne") and the Illinois Racing Board ("IRB") formed an enterprise, (hereinafter referred to as "the Enterprise") for the purpose of operating and promoting horseracing in Illinois.

2.      Defendants Hawthorne, Miller, Walsh, White, Folker-Calderon, Buechler, Kelley, and Eddy (hereinafter referred to as the "RICO Defendants"), all of whom are either employed by or associated with members of the Enterprise, conducted the affairs of the Enterprise through a pattern of criminal activities that enriched themselves, maintained their powerful positions, and generated

funds for the construction of a casino at Hawthorne. They effectuated their goal by knowingly racing injured, sick, and lame thoroughbred horses in violation of state and federal law. Over the course of 2022-2023, at least 21 horses were euthanized or died at Hawthorne Race Course from racing or racing related activities. The Plaintiff, Christine Tuma ("Dr. Tuma"), is a veterinarian formerly employed by Hawthorne. Dr. Tuma's daily activities at the racetrack were directed and overseen by the Chief State Veterinarian of the IRB. Dr. Tuma uncovered their criminal conspiracy and reported it to state and federal government regulators. On July 11, 2023, two days before a visit by federal regulators, Dr. Tuma's employment was terminated in retaliation for blowing the whistle on the illegal activities of the RICO Defendants.

3.      The Enterprise was formed in reaction to the decline of wagers placed on races run at RICO Defendant Hawthorne. Thoroughbred horse racing in Illinois has been in a steep decline for three decades due to public backlash over the treatment of animals in the sport, as well as the proliferation of alternative gambling outlets. To address the underlying issues of animal welfare, Congress enacted legislation to protect the horses in the sport, while the Illinois legislature passed legislation to protect the state's horse racing special interests. In 2020, Congress passed stricter animal welfare and safety legislation via the Horseracing Integrity and Safety Act (the "Act"). 15 U.S.C. §§ 3051–3060. The new federal regime under the Act sharply contrasts with recent Illinois legislation.

4.      Unlike most regulatory legislation and their enforcement bodies at the federal and state levels, the stated legislative intent of the Illinois legislature, and Illinois' horse racing regulator, the Illinois Racing Board ("IRB"), is to "support and enhance Illinois' horse racing industry" and "ensure that Illinois' horse racing industry remains competitive with neighboring states." Illinois Horse Racing Act of 1975 ("IHRA"), 230 ILCS 5/1 *et seq.* Under this mandate, in 2019, the Illinois legislature passed legislation to further benefit Illinois horse racing's special interests by expanding the taxes on newer

competitive gaming outlets, such as recently legalized sports betting in the state.[12] 230 ILCS 5/54.5, as amended by Ill. Pub. Act 101-0482 (2019).

5.     Hawthorne, along with other special interests from the Illinois horse racing industry, including horse owners, trainers, and the IRB, relies almost exclusively on the funds allocated to them from wagers placed by the betting public in Illinois and across the country on horse races run in the state. It was against this backdrop that the Enterprise was formed, and the RICO Defendants committed the federal and state crimes enumerated herein. The RICO Defendants, individually and collectively, used fraudulent means to induce bets on horses that they knew to be injured, sick, or lame, while concealing those conditions, and engaging in intentional and egregious acts of animal cruelty. Over a two-year period consisting of approximately seventy-five racing dates, the RICO Defendants through Chief State Veterinarian, Dr. Dawn Folker-Calderon, and Association Veterinarian, Dr. Beth Buechler, overturned the concerted independent medical assessment of Dr. Tuma and intentionally facilitated and fraudulently certified the running of over eighty sick, injured, or lame horses as fit or qualified to race, in violation of federal and state law.

6.     The RICO Defendants leveraged their respective roles to financially benefit the Enterprise, specifically, by fraudulently increasing the number of horses certified as fit (also known as sound) to run in regulated Illinois horse races at Hawthorne. The intent and result of their illegal actions was to increase the total wagers made by the betting public on races run at Hawthorne for their own financial gain. The entry of these horses into regulated Illinois races was not only a means for the RICO Defendants to induce wagers on horses that were not legally qualified to run, but in

---

[1]     The Horse Racing Equity Trust Fund established under the Illinois Gaming Act is funded by a percentage of casino and other revenue. The purpose of the fund is to support the horse racing industry in Illinois, which includes supplementing purses (prize money for races), supporting racetrack operations, and other related activities. 230 ILCS 10/*et seq.*

numerous instances, the certification of an additional horse and/or horses in a race, that allowed Hawthorne to run races that did not meet the legally mandated minimum number of entries required to run a wagered race under Illinois law. [3] The complaints made by Dr. Tuma to federal and state regulators included specific allegations that the RICO Defendants may have used this information themselves or via others to place illegal wagers or fix races.

7.      In furtherance of the Enterprise, the RICO Defendants individually and collectively deprived Dr. Tuma of her property, specifically her employment, when they violated:

a.      18 U.S.C. § 1343 (wire fraud);

b.      18 U.S.C. § 1955 (prohibition of illegal gambling businesses);

c.      18 U.S.C. § 1513(e) (retaliation)

c.      720 ILCS 5/28-1(b)(11) (transmitting information as to wagers, betting odds, or changes in betting odds); and

d.      230 ILCS 5/35 (conducting horse racing in Illinois in violation of the provisions of the Illinois Horse Racing Act).

8.      As more fully alleged herein, the RICO Defendants are liable for the damages caused to Dr. Tuma stemming from their violations of RICO, the Illinois Whistleblower Act, and the Illinois common law torts of civil conspiracy and retaliatory discharge.

## PARTIES

9.      Plaintiff, Dr. Christine Tuma ("Dr. Tuma" or "Plaintiff"), is a resident of McHenry County, and a former employee of Hawthorne Race Course, Inc.

10.      Dr. Tuma is a veterinarian licensed in Illinois and Wisconsin and has been practicing veterinary medicine since 2007.

---

[3]      11 Ill. Admin Code 1413.131 provides for the minimum number of horses required to run a pari-mutuel wagering race. In relevant part it provides if scratches reduce the number of horses in such a race to fewer than six, instead of cancelling the race altogether, Hawthorne, as the licensed association, may run the race as a non-wagering exhibition race.

11.     RICO Defendant, Hawthorne Race Course, Inc. ("Hawthorne") is a thoroughbred horse racetrack located in Cicero, Illinois.

12.     Defendant, the Illinois Racing Board ("IRB") is a regulatory agency of the State of Illinois.

13.     RICO Defendant, Jim Miller ("Miller") is an employee of and the Director of Racing at Hawthorne.

14.     RICO Defendant, John Walsh ("Walsh") is the Assistant General Manager of Hawthorne.

15.     RICO Defendant Dawn Folker-Calderon ("Calderon") is the State Veterinarian and an employee of the IRB. In furtherance of the illegal activities discussed herein, Calderon was promoted by the board of the IRB from the position of "State Veterinarian" to "Chief State Veterinarian," along with an increase in compensation, after they first became aware of the allegations herein.

16.     RICO Defendant, Beth Buechler ("Buechler") is an association veterinarian employed by Hawthorne.

17.     RICO Defendant, Dave White ("White") is Hawthorne's Thoroughbred Racing Secretary and an employee of Hawthorne.

18.     At all times relevant herein, RICO Defendant Thomas Kelley ("Kelly"), was a state steward and an employee of the IRB.

19.     RICO Defendant John Eddy ("Eddy") is a state steward and an employee of the IRB.

### JURISDICTION AND VENUE

20.     This action is brought pursuant to 18 U.S.C. §§ 1961-1968 and involves claims arising under the laws of the United States. This Court has jurisdiction over this action pursuant to 28 U.S.C.

§ 1331, which confers original jurisdiction on federal district courts to hear civil actions arising under federal laws.

21.     This Court also has jurisdiction pursuant to 18 U.S.C. § 1964(c), which provides that any person injured in his or her business or property by reason of a violation of 18 U.S.C. § 1962 may sue in any appropriate United States district court.

22.     Furthermore, this Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a) as these claims are so related to the federal claims that they form part of the same case or controversy.

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a) as a substantial part of the events or omissions giving rise to the claims occurred in this district, and because the Defendants reside, are found, have agents, or transact their affairs in this district.

## BACKGROUND

24.     The primary purpose of the Enterprise was to increase the number of horses racing, increase the total number of races run, drive up their respective monetary portion of the takeout, and protect their powerful positions.

25.     Each of the RICO Defendants conducted or participated in the conduct of the Enterprise's affairs. The RICO Defendants conducted the Enterprise's affairs by intentionally violating federal and state laws when they certified lame and sick horses to race, while abusing the animals in their care and defrauding the betting public.

26.     The activities of the Enterprise and the attendant causes of actions against the RICO Defendants as alleged herein took place against the backdrop of the following and motivated the formation and operation of Enterprise:

        a.   the decline of the horse racing industry in Illinois;

    b.   the divergent federal and state regulation of the horse racing industry;

    c.   the role of wagering in the funding of Illinois horse racing's special interests;

    d.   Hawthorne's deteriorating financial condition;

    e.   the regulatory roles and responsibilities of veterinarians at Hawthorne under federal and state Law; and

    f.   the medical assessment of lameness, its long-term impact on animal welfare and the use of this inside information in wagering.

## I.    The Decline of Horse Racing in Illinois

27.    At its peak in 1989, Illinois had six thoroughbred racetracks licensed to race in the state, including Arlington Park, Balmoral Park, Sportsman's Park, Maywood Park, Fairmount Park and Hawthorne.

28.    Each year the IRB approves a series of racing dates. The series of races dates approved by the IRB for a particular racing season are referred to as a "meeting." The total dollar amount wagered in any individual race or collectively in a meeting is referred to as the "handle."

29.    Collectively, in their peak in 1989 these racetracks generated handles in excess of $1.2B per year.

30.    By 2023 the amount wagered in Illinois had drastically fallen to $490,000,000 per year, and only two racetracks remained active, Fairmount Park, located in downstate Illinois, and Hawthorne.

31.    The handle from horse racing in Illinois has been on a steady decline for the past three decades. This decline is a result of two factors.

32.    The first is broader public attention to animal cruelty in the sport. This attention has come after a series of high-profile scandals including:

    a.   the deaths of 30 horses in a few short months at Santa Anita Park in 2019;

    b.   a spike in horse race fatalities in 2011 and 2012 at Aqueduct Racetrack;

  c. the 2008 euthanizing of Eight Belles on the track after finishing second in the Kentucky Derby; and

  d. a series of doping scandals including the indictment and conviction of trainers Jorge Navarro and Jason Servis for the use of performance enhancing drugs to the animals in their care.

33. The second factor in the decline of horse wagering in Illinois is the legalization of riverboat casinos, land-based casinos, and sports books in Illinois and Northwest Indiana, along with a host of new competitive online gambling options.

## II. The Divergent Federal and State Oversight of the Horse Racing Industry

34. The activities of the Enterprise and the RICO Defendants were set against a backdrop of starkly contrasting regulation of horse racing at the state and federal levels.

35. In recent years, Congress and the Illinois legislature have taken diametrically different views on the regulation of the horse racing industry. In 2020, determined to stop the rampant animal cruelty and doping scandals in horse racing, Congress passed the Act. The Act provides for the establishment of national standards for medication, track safety, and the overall welfare of racehorses.

36. The Act provided for two new regulatory bodies operating under the auspices of the Federal Trade Commission ("FTC"). The first, the Horseracing Integrity and Safety Authority ("HISA"), whose operations are in Lexington, Kentucky. HISA is responsible for establishing and enforcing uniform standards for horse racing in the United States. This includes rules related to anti-doping, medication control, and track safety. 15 U.S.C. § 3053(b)(2). The second, the Horseracing Integrity and Welfare Unit (HIWU), operating under HISA, is specifically tasked with the enforcement of the Anti-Doping and Medication Control ("ADMC") Program, and ensuring compliance with the rules set by HISA. Federal Trade Comm'n, *Order: Anti-Doping and Medication Control Rulemaking* (March 27, 2023).

37. HISA's initial set of rules and regulations came into effect on July 1, 2022. Fed. Trade Comm'n, *Order Approving the Racetrack Safety Rule Proposed by the Horseracing Integrity and Safety Authority*

(March 3, 2022) ("Safety Order").

38.     These regulations include rules related to racetrack safety and operational standards designed to enhance the welfare of racehorses and the integrity of the sport. *See generally* HISA Rules and Regulations 1000-9000.

39.     Congress' actions were necessary to fill the void of animal welfare legislation in states such as Illinois. Prior to the federal government's establishment of HISA and HIWU, horse racing in Illinois was solely regulated by the IRB.

40.     Unlike HISA and HIWU whose remit as a regulator is solely to ensure racetrack safety and the welfare of the animals, the legislative mandate of the Illinois Racing Board conflicts with the role of a traditional governmental regulatory bodies.

41.     The role of a governmental regulatory body is to enforce laws and regulations and to protect the public interest by ensuring that industries, markets, and other entities operate fairly, safely, and transparently. However, the IHRA lists six public policies of the state's racing legislation in conjunction with the attendant legislative mandate of the IRB. The first five solely deal with the promotion of the sport in the state and are as follows:

    a.  support and enhance Illinois' horse racing industry, which is a significant component within the agribusiness industry (b) ensure that Illinois' horse racing industry;

    b.  remain[] competitive with neighboring states;

    c.  stimulate growth within Illinois' horse racing industry, thereby encouraging new investment and development to produce additional tax revenues and to create additional jobs;

    d.  promote the further growth of tourism;

    e.  encourage the breeding of thoroughbred and standardbred horses in this

State;

and only the final policy mandated relates to ensuring public confidence and trust in the credibility and integrity of racing operations and the regulatory process. 230 ILCS 5/1.2.

42.    As a result, one of the peculiarities of the IHRA is the creation of numerous state funds intended to exclusively benefit the various special interests in the Illinois horse racing industry. *Id.* at §§ 5/26; 5/28; 5/30; 5/54.75. In addition, a separate tax is levied on Illinois' casinos and sportsbooks for the exclusive benefit of the Illinois horse racing industry. 230 ILCS 10/13.1**.**

### III.    The Role of Wagering in the Funding of Illinois Horse Racing's Special Interests

43.    The Enterprise, via the RICO Defendants, leveraged their collective ability to drive up the tax dollars and fees generated from wagers placed by the betting public. These tax dollars and fees were exclusively earmarked for the special interests of Hawthorne and the Illinois horse racing industry.

44.    At all times relevant herein, Hawthorne held a license granted by the State of Illinois to operate a pari-mutuel system of wagering on thoroughbred horses pursuant to 230 ILCS 5/3.12.

45.    A pari-mutuel system of wagering is a form of wagering on the outcome of horse races in which wagers are made on a horse or combination of horses and all wagers for each race are pooled and held by a licensee for distribution in a manner approved by the IRB.

46.    Pari-mutuel bettors in Illinois and across the United States place wagers on the outcomes of races run at Hawthorne via numerous in-person and online gambling sites such as FanDuel.[4]

47.    Funds wagered on races at Hawthorne are segregated as part of the pari-mutuel pool. These funds are then placed in the custody of Hawthorne's Thoroughbred Racing Secretary, White, and used to pay out winning bettors, and to pay prize money, referred to as "purses," to the owners

---

[4] https://account.nj.sportsbook.fanduel.com/support (last visited January 8, 2025).

of winning horses.

48.     These funds flow to Illinois racetracks (known as "associations" or "licensees" for state and federal regulatory purposes) and other state horse racing interests in two primary ways.

49.     The first is by way of an unusual circular flow of tax and pseudo-tax dollars generated in the form of license fees, admission taxes, pari-mutuel taxes, surtaxes, and miscellaneous fees.

50.     Hawthorne and White then remit these funds to the special interests legislated by the IHRA, including:

    a.  the RICO Defendants and the IRB;

    b.  various non-Defendants belonging to the Illinois Thoroughbred Horseman's Association ("ITHA"), whom the Enterprise's activities also benefited,[5] and

    c.  the various Illinois municipalities in which Hawthorne and the off-track betting parlors it owns, operate.

51.     The funds established by the IHRA include the:

    a.    Illinois Thoroughbred Breeders Fund (ITBF), 230 ILCS 5/30;

    b.    Horse Racing Purse Fund, 230 ILCS. 5/26; 230 ILCS 5/28;

    c.    Racetrack Improvement Fund, 230 ILCS 5/26; and,

    d.    Horse Racing Equity Trust Fund, 230 ILCS 54.75.

52.     The second source of funds is the "takeout" from the total handle itself. This is a percentage of all funds wagered on Hawthorne races and is authorized annually by the IRB pursuant to the IHRA. The takeout ranges from 5-15% of the gross amount wagered by the public. 230 ILCS 5/26.

53.     The takeout is the major source of Hawthorne's revenue and profits. It is used by Hawthorne to pay various expenses, including the salaries and bonuses of employees including

---

[5]     The Illinois Thoroughbred Horsemen's Association represents nearly 2,500 thoroughbred owners and trainers working around the year at Hawthorne Race Course. *https://www.itharacing.com/about-itha.*

Defendants Miller, Walsh, and White.

54.     As the amount wagered in Illinois has decreased, so too have the income, profits, and cash flow of Hawthorne.

55.     The amounts remitted to the special interests, including Hawthorne, the IRB, the ITHA, and its members from these funds fluctuate with the amount wagered by the public, thereby aligning the incentives of all RICO Defendants.

**IV. Hawthorne's Deteriorating Financial Condition**

56.     To prop up this dying industry, the Illinois legislature enacted PA 1010-0031 the "Rebuild Illinois Capital Plan," which provides for existing racetracks in Illinois to operate casino-style gambling on their premises, hereinafter referred to as a "racino." 230 ILCS 5/7.7.

57.     The Illinois Gaming Board approved Hawthorne to proceed with the construction of a racino in July 2020.

58.     As of the filing of the instant complaint, due to their financial condition, Hawthorne has been unable to secure funding for the construction of a racino under the license granted to them.

59.     Since 2022, several mechanics' liens totaling over $5 million dollars have been filed against Hawthorne, alleging unpaid construction costs related to the construction of the racino.

60.     On numerous occasions in recent years, Hawthorne has failed to timely remit the funds collected and owed to the State of Illinois and other constituents.

61.     By way of example, Hawthorne made several late payments of funds it owed for taxes on wagers made at its off-track betting sites in 2023.

62.     Hawthorne's failure to timely pay the off-track betting ("OTB") handle tax subjected it to fines from the IRB, that were never levied by the IRB. *See* 230 ILCS 5/26(h)(12)(A).

63.     Additionally, in 2023 Hawthorne failed to timely remit the amounts owed to the Racing Industry Charitable Foundation ("RICF"). The RICF is a charity that purportedly provides on-

site medical, dental, social services, licensed outpatient substance abuse programs and community mental health clinics to the employees and residents on the backstretches of the racetracks in Illinois. RICO Defendant Miller serves as the president of RICF.

64. Under the IHRA, if a licensee willfully fails to remit its contribution to the RICF, the IRB may revoke its license to conduct horse racing. 230 ILCS 5/31.1.

65. As a member of the Enterprise, the IRB levied no fines or penalties and did not move to revoke Hawthorne's license.

## V. The Regulatory Roles and Responsibilities of Veterinarians at Hawthorne under Federal and State Law

66. As discussed more fully below, the veterinarians who perform official regulatory duties under state and federal law, determine the eligibility of horses to race in the state and allowed the Enterprise and the RICO Defendants to use their authority to perpetuate its goals.

67. The federal and state regulatory classification of veterinarians who work at racetracks in Illinois fall into three classifications: (a) State Veterinarians, (b) Track/Association Veterinarians, and (c) Attending Veterinarians.

68. Attending Veterinarians, similar to private veterinarians for household pets, are private contractors paid by the horse's owners to provide ongoing medical care to their horses. HISA Rule 2010; 11 Ill. Admin. Code § 505.10.

69. State Veterinarians and Association Veterinarians contrast with Attending Veterinarians, as the State and Association Veterinarians have specified regulatory duties are that are explicitly mandated by the IHRA, the IRB and HISA and do not pertain to the ongoing medical care of horses, but rather with compliance with the respective regulatory regimes. HISA Rule 1020; 11 Ill. Admin. Code § 502.10

70. Collectively, State and Association Veterinarians are referred to as "Official Veterinarians," in the various applicable state and federal statutes, rules and regulations.

13

71.     The roles and responsibilities of Official Veterinarians are regulated concurrently under Illinois and federal law.

72.     The IHRA provides for the employ and appointment of State Veterinarians by the IRB. State veterinarians, including RICO Defendant Calderon, have primary responsibility for maintaining the safety of racehorses before, during, and after a race. *Id.* at § 502.10.

73.     These responsibilities include conducting pre-race examinations, monitoring horses' health during races, ensuring compliance with veterinary regulations, maintaining records of examinations and treatments, and administering blood and urine tests to detect doping. *Id.* at §§ 502.70; 503.20; 505.50; 603.70

74.     11 Ill. Admin. Code §605.10 provides that State Veterinarians shall:

    a.  report to the Stewards all examinations and inspections of any horse or premises under the jurisdiction of the Board;

    b.  establish procedures, relative to the IHRA that will govern all practicing veterinarians at the racetrack;

    c.  be consulted about any alleged violations of the IHRA;

    d.  maintain a Veterinarian's list; and,

    e.  at the close of each meeting, make a written report to the IRB of the conditions of the meeting and any recommendations they deem advisable.

75.     Similar to the definition of a State Veterinarian under Illinois law, federal law defines a Regulatory Veterinarian as a veterinarian who is employed, contracted, or appointed by a State Racing Commission, Racetrack, the Authority, or HISA to monitor the health and welfare of Covered Horses. HISA Rule 1020.

76.     Relevant to the instant matter, HISA Rule 2135 provides that it shall be the responsibilities and duties of the Regulatory Veterinarian to:

    a.  conduct pre-race inspections on all potential starters on Race Day;

    b.   inspect any Covered Horse when there is a question as to the physical condition of such Covered Horse independent of the Covered Horse's entry status; and

    c.   remove a Covered Horse from the Veterinarians List in accordance with Rules 2241 and 2242.

77.     HISA defines an Association Veterinarian as a veterinarian employed by a racetrack.

78.     Relevant to the instant matter, Plaintiff Dr. Tuma and RICO Defendant Buechler were Association Veterinarians. *Id.* at 1020.

79.     Association veterinarians perform their duties at the request of and under the auspices of a State/Regulatory Veterinarian. HISA Rule 2010; 11 Ill. Admin. Code § 502.20

80.     Official Veterinarians are authorized to:

    a.   access any and all Horses housed on Racetrack grounds regardless of entry status;

    b.   perform inspections of any Horse at any time;

    c.   observe Horses during training activities and workouts;

    d.   perform pre-race veterinary inspections and post-race observations; and

    e.   place a Horse on the Veterinarians' List.

    f.   In addition, an association veterinarian may scratch any horse that in her opinion [is], injured, ill, or otherwise unable to compete due to medical or health related condition. *Id.*

81.     The responsibilities of Association Veterinarians at Hawthorne, including Dr. Tuma and Buechler were delegated to them by Calderon, the Chief State Veterinarian.

82.     Relevant to the instant matter, these responsibilities included conducting the pre-race exams, whereby horses were assessed for racing soundness and medical fitness to run in that day's races, under IRB and HISA rules.

**V.    Qualifications of Horses to Race and the Minimum Number Required**

83.     All horses entered into a race in Illinois must undergo a pre-race veterinary examination by an Official Veterinarian to ensure that the horse is fit to race. 11 Ill. Admin. Code § 603.20; HISA Rule 2142(c).

84.      Illinois law requires State Veterinarians keep a continuing health and racing soundness record of each horse examined. *Id.* § 603.60.

85.     Illinois law provides that:

    a.  No horse is qualified to run in any race unless he is duly entered for that race;

    b.  No disqualified horse shall be entered for a race; and

    c.  No disqualified person shall enter a horse in a race.

11 Ill. Adm. Code Section 1413.20.

86.     No horse on the state Veterinarian's List (*see* Rule #51A) (11 Ill. Adm. Code Section 1403.63) or the Steward's list (*see* Rule #34B) (11 Ill. Adm. Code 1402.165) shall be entered for a race.

87.     A horse is ineligible if it is not qualified to participate in a specific race under the rules and conditions of that race. *Id.* at §1413.30.

88.     Under Illinois and federal law, horses that are determined to be ineligible to compete in a regulated horserace must be placed on the State Veterinarian's List until released by a Regulatory Veterinarian. *Id;* HISA Rule 2240(a).

89.     The removal of a horse unqualified or unfit to run in a specified race is referred to as a "scratch."

90.     Illinois and federal law require that horses must be scratched from a race if they are assessed as sick or lame (lameness is also frequently referred to in legislation and regulation as "unsound"). HISA Rule 2141; 11 Ill. Admin. Code § 1413.50

91.     Pursuant to federal law, horses designated as sick by a Regulatory Veterinarian are restricted from racing for at least seven days, and horses designated as lame (unsound) are restricted from racing for at least fourteen days. HISA Rule 2241(a)(1); HISA Rule 2241(a)(5).

92.     Illinois and federal law require that all horses disqualified from racing because of sickness or lameness must be promptly reported to the State Steward and an electronic record maintained and transmitted to the IRB and HISA of the veterinarians' assessments. HISA Rule 2251(b); 11 Ill. Admin. Code §603.60

93.     The Illinois regulations attendant to the qualifications of a horse as fit to race state that:

   a.  every horse entered to race shall be examined by the track veterinarian or a licensed veterinarian authorized by the Board before the race. The veterinarian shall determine whether the horse is physically fit to race.

   b.  the veterinarian shall certify that the horse is sound and in fit condition to race. If, in the opinion of the veterinarian, the horse is not in fit condition to race, the horse shall be scratched from the race.

11 Ill. Admin. Code §603.50.

94.     HISA Rule 2132 requires a comprehensive examination of each horse by a veterinarian prior to the race (the pre-race exam). The veterinarian must certify that the horse is in good health and sound condition, explicitly noting that any horse exhibiting signs of lameness is to be scratched from the race.

95.     Finally, 11 Ill. Admin Code § 1413.131 provides for the minimum number of horses required to run a pari-mutuel wagering race in the State of Illinois. In relevant part it provides if scratches reduce the number of horses in such a race to fewer than six, instead of cancelling the race altogether, Hawthorne, as the licensed association, may run the race as a non-wagering exhibition race.

96.     Had these races been legally run as non-wagering races, the Enterprise would have been deprived of the associated revenue from the handle and takeout.

VI.     **The Medical Assessment of Lameness, its Long-Term Impact on Animal Welfare and The Use of this Inside Information on Wagering.**

97.     The Merck Veterinary Manual describes lameness in horses as:

> an abnormal stance or gait caused by either a structural or a functional disorder of the locomotor system. The horse is either unwilling or unable to stand or move normally. Lameness is the most common cause of loss of use in horses. It can be caused by trauma, congenital or acquired disorders, infection, metabolic disorders, neurologic deficits or circulatory system disease.[6]

98.     Lameness often originates from musculoskeletal injuries, including tendinitis, fractures, or joint inflammation.[7]

99.     When a horse is forced to race despite these injuries, the biomechanical stress placed on the affected limb(s) increases significantly. [8]

100.    The repetitive strain from racing exacerbates these injuries, often leading to catastrophic breakdowns, such as complete fractures or ruptured tendons, which can necessitate euthanasia.[9]

101.    Lameness can alter a horse's gait, causing uneven distribution of weight and leading to compensatory injuries in other limbs. [10]

---

[6]     Merck Veterinary Manual, *Overview of Lameness in Horses*, https://www.merckvetmanual.com/musculoskeletal-system/lameness-in-horses-overview-and-examination/overview-of-lameness-in-horses (last visited Sept. 5, 2024).

[7]     *Id.*

[8]     J. McIlwraith, et al., The Biomechanics of the Equine Limb and Its Effect on Lameness, Veterinarian Key (July 23, 2023), https://veteriankey.com/the-biomechanics-of-the-equine-limb-and-its-effect-on-lameness.

[9]     Laura Kennedy, DVM**,** *Studying Catastrophic Racehorse Breakdowns: Research That Can Save Lives*, Equine Programs, University of Kentucky College of Agriculture, Food and Environment, https://equine.ca.uky.edu/studying-catastrophic-racehorse-breakdowns (last visited Sept. 5, 2024).

[10]    Elizabeth J. Davidson, DVM, *Lameness Evaluation*, (2018), https://cmapspublic3.ihmc.us/rid=1W6CKNF4K-1MRD964-1ZLM/Lameness%20Evaluation.pdf.

102.     Horses with lameness are at a higher risk of developing secondary injuries in previously healthy limbs due to altered locomotion. This increased risk of multi-limb injury can make recovery more difficult and may result in long-term disability.[11]

103.     Chronic lameness in horses is often associated with long-term orthopedic issues, such as degenerative joint disease or osteoarthritis. These conditions result from sustained inflammation and damage to joint tissues, which worsen when a horse continues to race while lame. The repetitive trauma to the joints accelerates the degenerative process, leading to persistent pain and reduced mobility.[12]

104.     The long-term financial impact of a diagnosis of lameness in horses extends to the horse's potential as a breeding prospect. Lameness, especially when chronic, can reduce a horse's value in the breeding market.[13]

105.     There are a myriad of medical conditions that can lead to lameness, and not all of them directly correlate to a horse's ability to perform well in a particular race.[14] Often the catastrophic consequences to the horse's safety and welfare are only evident later.  By way of example:

    a.  On May 14, 2023, Dr. Tuma's lameness assessment of Imagine Gold was overturned by RICO Defendants Buechler and Calderon. Imagine Gold finished in second place in Race 7. That race would be its last. Imagine Gold was euthanized at Hawthorne nine days later on May 23, 2023, citing "carpus injury and intractable pain," as the

---

[11]     Michael W. Ross & Sue J. Dyson, *Diagnosis and Management of Lameness in the Horse* 111-15 (2d ed. 2010).

[12]     *Id.* at 633-35.

[13]     National Economic Cost of Equine Lameness, Colic, and Equine Protozoal Myeloencephalitis (EPM) in the U.S., *The Walking Horse Report*, https://www.walkinghorsereport.com/news/national-economic-cost-equine-lameness-colic-equine-417 (Dec. 7, 2001).

[14]     Hansen, Stefanie H., Bramlage, Lawrence R., & Moore, George E. *Racing Performance of Thoroughbred Racehorses with Suspensory Ligament Branch Desmitis Treated with Mesenchymal Stem Cells (2010–2019)*, Equine Veterinary Journal, vol. 56, pp. 503–513, (2024).

medical basis requiring its euthanasia.

   b. Exhibit B depicts "Dastardly Deeds" a horse whose hind legs severely crossed over one another in a condition called "rope walking" or "plating." Plating is often a sign of a neurological disorder. This horse was assessed as lame by Dr. Tuma and finished in third place in Race #8 on July 6, 2023.

106.   Professional athletes, like horses, often "play through the pain," achieve notable victories, yet suffer long term severe health consequences. Examples include:

   a. Tiger Woods (Golf) won the 2008 U.S. Open despite a torn ACL and stress fractures in his leg.

   b. Kurt Angle (Wrestling) won the 1996 Olympic gold medal in wrestling with a broken neck.

   c. Kerri Strug (Gymnastics) competed with a torn ankle ligaments to secure the gold medal for the U.S. in the 1996 Olympics.

   d. Muhammad Ali (Boxing) suffered from Parkinson's syndrome, exacerbated by years of head trauma, yet continued fighting and winning titles even after showing early signs of the condition.

   e. Peyton Manning (NFL) won a Super Bowl with the Denver Broncos in 2016 despite severe neck issues that required multiple surgeries.

107.   Professional sports are replete with examples of insiders using information to benefit from or place illegal wagers using information on an athlete's conditions. By way of example, in 2007, NBA referee Tim Donaghy ("Donaghy") and his co-conspirators, James Battista and Thomas Martino, used Donaghy's inside information of player injuries not disclosed to the public. Amongst other illegal betting, Donaghy bet on games where he knew a player was injured or expected to have limited playing time due to injury.[15]

---

[15]   Tim Donaghy, How Former Ref Tim Donaghy Conspired to Fix NBA Games, ESPN (Feb. 8, 2019), https://www.espn.com/nba/story/_/id/25980368/how-former-ref-tim-donaghy-conspired-fix-nba-games.

## FACTS

### I.     The IRB and Hawthorne Are Plaintiff's Co-Employers

108.    At all times relevant herein Dr. Tuma served as an Association/Official Veterinarian.

109.    From the commencement of her employment, Dr. Tuma observed that RICO Defendant Hawthorne had no regard for the welfare of the animals under their charge. She observed one or more scenes similar to those described by Upton Sinclair of the heinous conditions in Chicago slaughterhouses from his novel The Jungle. "The stench of the warm blood, together with the smell of the wastewater." A photo of a horse whose demise was of unknown cause located in a shedrow shortly after the commencement of Tuma's employment is attached as Exhibit A.

110.    The IRB and Hawthorne were joint employers of Dr. Tuma and shared in all the essential terms and conditions of her employment, as described below.

111.    Association Veterinarians, such as Dr. Tuma, must be granted an occupation license from the IRB in order to work at any Illinois facilities. 230 ILCS 5/15.

112.    The IRB has authority to deny, suspend, or revoke an occupation license, thereby prohibiting a veterinarian from working in the state. *Id.*

113.    Further, prior to the start of any race meeting, Illinois racetracks must submit a list of all racing officials and employees, including Veterinarians, to the IRB for approval to participate in the upcoming meeting. 11 Ill. Admin Code § 422.10.

114.    At all relevant times herein, Calderon was an employee of the IRB and a State/Regulatory veterinarian.

115.    In her capacity as a State Veterinarian and an employee of the IRB, Calderon oversaw Dr. Tuma's daily veterinary duties including without limitation: giving specific instructions on daily veterinary tasks, assigning her horses to evaluate, allocating ancillary work separate and apart from pre-race exams, performing more comprehensive evaluations of horses for removal off of the State

Veterinarian's list on days when there were no races scheduled, and despite not being an employee of Hawthorne, instructing and ensuring Dr. Tuma's compliance with Hawthorne's policies and procedures.

116.    As an employee of Hawthorne, Dr. Tuma concurrently reported to Miller.

117.    Miller reported to Walsh.

118.    Miller, Walsh, and Hawthorne were authorized to set Dr. Tuma's compensation, promulgate work rules including those involving track access, and oversee her general working conditions.

119.    Miller, Walsh, and Hawthorne had the authority to approve requests for time off and assign Dr. Tuma days or shifts she could or could not work.

120.    Miller, Walsh and Hawthorne had the authority to hire and/or fire Dr. Tuma.

## II.    RICO Defendants Miller, White, and Walsh's Roles and Responsibilities

121.    In Miller's role as racing director, he was responsible for publicity, horseman's relationship (through the "ITHA"), and served as the Hawthorne racing analyst.

122.    In White's role as racing secretary, he was responsible for: (a) race planning and scheduling; (b) the eligibility requirements for horses and the entry process into the race; (c) overseeing the draw which dictates what positions each horse will start the race; and (d) other compliance with regulations as discussed more fully herein.

123.    As the Assistant General Manager at Hawthorne, Walsh was responsible for: (a) overseeing day-to-day operations; (b) employee management; (c) ensuring that the racetrack meets all regulatory and operational standards; and (d) budget and financial management.

124.    Among their other responsibilities at Hawthorne, Miller and White were responsible for setting the morning line odds.

125.    The morning line odds are the initial pre-race odds set by a track's oddsmaker (also

known as a "handicapper") before betting begins on a particular race.

126. The morning line is transmitted to bettors nationwide via: (a) publication of the Hawthorne daily racing program; (b) posting on Hawthorne's website; (c) other online betting platforms referred to as Advance Deposit Wagering ("ADW"); (d) Hawthorne's racing broadcast; and (e) distribution to nationwide syndicated services.

### III. The RICO Defendants Conspired to Run Lame, Injured, and Sick Horses

127. The RICO Defendants first agreed to and then defrauded the betting public in Illinois and around the country by:

      a.    increasing the number of horses running in a race; and

      b.    running races that did not meet the minimum race card requirements without the addition of lame, sick, or injured horses not legally permitted to race under federal or state law.

128. By running additional lame and/or sick horses not legally eligible to race, the Enterprise and the RICO Defendants were able to significantly increase the amounts wagered on a specific race by more than ten thousand dollars.

129. RICO Defendant Hawthorne and RICO Defendants Miller, White and, Walsh, all executives employed at Hawthorne, further benefited from larger numbers of horses in a race via increased ticket/gate fees and concession sales.

130. The RICO Defendants all agreed to and subsequently collaborated on illegally increasing the handle, takeout, and their corresponding share of the proceeds from the numerous state funds and sur-taxes, while ensuring that they protected their own jobs.

131. Miller succinctly stated the primary goal to other RICO Defendants and participants in the Enterprise in a June 25, 2023 text message, "I am just trying to keep horses here, so we can all keep jobs."

132. Beginning with the Spring 2022 racing meeting, in the morning before each day's races,

Buechler and Tuma, the two Association Veterinarians, would divide the list of horses, each having responsibility for the pre-race exam of half of the horses running that day.

133.    Attendant to the new HISA regulations and in furtherance of the existing Illinois regulations that came into effect in 2022, Dr. Tuma during her pre-race exams began performing a more thorough gait analysis of the horses under her charge by taking them out of the barn stalls to observe their walk and trot.

134.    HISA Rule 2142 requires that the pre-race examination include, among other things, "observation of the Covered Horse jogging in hand, moving toward and away from the Veterinarian so that both hind-end and front-end motion can be evaluated" and "placement of the covered horse on the Veterinarians' List if the Covered Horse does not jog sound or warm up to the Regulatory Veterinarian's satisfaction."

135.    For the 2022 racing meeting, pursuant to state and federal law, Dr. Tuma was authorized by Calderon to scratch horses who in her medical opinion were not qualified to run, and routinely did so.[16]

## IV.    The Assault and Battery of Dr. Tuma by Members of the ITHA or their Agents

136.    Dr. Tuma's scratching of horses did not go unnoticed by others associated with the RICO Defendants, including Max Quinones ("Quinones"), a Hawthorne trainer and member of the ITHA.

137.    After complaints by various owners and trainers to the RICO Defendants regarding Dr. Tuma's scratches, Quinones caused a horse to lurch menacingly at her, threatening grave bodily harm.

138.    Dr. Tuma reported this incident to a number of the RICO Defendants, including

---

[16]    Under HISA Rule 2135, an Association Veterinarian may perform the pre-race examination if the Regulatory Veterinarian is unable.

members of Hawthorne's security, Miller, Eddy, and Calderon, and provided a documented incident report.

139.     Subsequently, in October of 2022, a groom employed by Quinones physically battered Dr. Tuma. As with the prior assault, Dr. Tuma reported this incident to Calderon, Eddy, and Miller.

140.     In both instances only a nominal fine was levied against the perpetrators.

## V.     Dr. Tuma's First Set of Protected Activities and Complaints to Government Officials

141.     The 2022 thoroughbred racing dates at Hawthorne were approved by the IRB, pursuant to the IHRA, and consisted of two meetings. The first, the spring meeting, was thirty-three days commencing April 2, 2022 and ending June 25, 2022. The second, the fall meeting, was forty-two days commencing on September 23, 2022, and ending on December 31, 2022.

142.     It was during the fall meeting in 2022 that Dr. Tuma uncovered the full extent of the illegal running of sick and lame horses by the RICO Defendants.

143.     On or around the same time, Dr. Tuma uncovered and began investigating alterations of the medical records of these horses.

144.     Dr. Tuma recorded her assessments in the Track Manager software, a software which transmitted via electronic means the medical assessments of horses running in Illinois to the IRB and HISA.

145.     Dr. Tuma discovered that on multiple occasions, her assessments of horses as "scratch lame" had been tampered with by Calderon and Buechler and changed to "racing sound" the indication to state regulators that the horse was fit to run or "scratch sick."

146.     As early as the spring meeting of 2022, Dr. Tuma first noticed that when Buechler assessed a horse as lame, requiring a minimum two-week layoff under federal law, Buechler would surreptitiously ask the horses' trainer while in the barn during the pre-race exam, if the trainer would

prefer to scratch the horse themselves as "sick" via the submission of a falsified trainer initiated scratch request.

147.   Then in the fall meeting of 2022, Dr. Tuma uncovered that when Buechler solicited a "sick scratch" from the trainer, Dr. Tuma's assessment as "scratch lame" would be deleted in the system, a "sick scratch" would be input making it appear as if the scratch originated from the trainer, and Buechler would not input her own lame findings in the system.

148.   The use of a trainer sick scratch avoided the horse's placement on the Veterinarian's List altogether. Thereby, avoiding both the seven-day layoff if a sick scratch was made by Buechler, a Regulatory Veterinarian, or the fourteen-day layoff mandated for a lame horse under federal law.

149.   Buechler's actions allowed numerous horses to illegally run prematurely in Illinois horse races.

150.   In the fall of 2022, Dr. Tuma began making a series of complaints to Calderon and Buechler about the illegal and fraudulent scratching of horses and the misclassification of horses as sick from lame.

151.   In response to Dr. Tuma's efforts to thwart their illegal activity, RICO Defendant Calderon informed Dr. Tuma of a new protocol applicable to scratches in the fall of 2022 meeting.

152.   When Dr. Tuma returned to work for the fall of 2022 meeting, she was informed by Calderon that she had been stripped of her authority to scratch horses and that this protocol was now in effect.

153.   The new protocol required that when an Association Veterinarian, such as Dr. Tuma, assessed a horse as sick or lame during a pre-race exam, the Association Veterinarian must call for an examination by a second Association Veterinarian (in all instances Buechler). Then, if the two Association Veterinarians did not concur on the assessment, Calderon herself would decide in her capacity as State Veterinarian.

26

154.     For the fall of 2022 meeting alone, Dr. Tuma assessed at least the following thirty-four

horses as lame and unsound to run:

| Date | Race | Horse Name |
|------|------|------------|
| December 30, 2022 | 10 | Mud Hut |
| December 30, 2022 | 2 | Emoji Guy |
| December 30, 2022 | 1 | Nagy and Da Bears |
| December 18, 2022 | 2 | Born Again George |
| December 18, 2022 | 7 | Scat Shack |
| December 18, 2022 | 7 | Carlos L |
| December 18, 2022 | 4 | River Finn |
| December 17, 2022 | 8 | Richiesgotswagger |
| December 17, 2022 | 5 | Dark Hedges |
| December 17, 2022 | 8 | J's Twostep Beauty |
| December 16, 2022 | 3 | Frisco Line |
| December 16, 2022 | 5 | Wicked Surprise |
| December 16, 2022 | 1 | White Cashel |
| December 16, 2022 | 1 | Sure Shot Annie |
| December 16, 2022 | 5 | Uncle Dick |
| December 11, 2022 | 1 | Naughty Alfred |
| December 2, 2022 | 5 | Buxterhooter |
| December 2, 2022 | 7 | Ghaaleb the Great |
| December 2, 2022 | 5 | Gagoots |
| November 25, 2022 | 2 | Nomandy Angel |
| November 12, 2022 | 4 | Loring Park |
| November 12, 2022 | 4 | Power Through |
| November 12, 2022 | 7 | A Bold Ryde |
| October 28, 2022 | 4 | Daahers Bully |
| October 22, 2022 | 9 | Cool Cat Charlie |
| October 22, 2022 | 1 | Goldenpence |
| October 21, 2022 | 6 | Bens Malice |
| October 21, 2022 | 3 | Follow the Signs |
| October 8, 2022 | 7 | Carlos L |
| October 7, 2022 | 5 | Dark Hedges |
| October 7, 2022 | 7 | Zarmae |
| October 7, 2022 | 1 | Izzy in a Tizzy |
| October 2, 2022 | 4 | Someone Said So |

October 1, 2022                          7    American Mayhem

155.    She was overturned by Buechler and Calderon in thirty of these instances.

156.    In the remaining four instances, three horses were allowed to be scratched sick. Only one was concurred on by all three Veterinarians. This was on October 7, 2022, when the horse, Izzy in a Tizzy, broke through a gate and was obviously injured.

157.    In doing so, Calderon and Buechler, in concert with the other RICO Defendants, fraudulently transmitted certifications to the IRB in Illinois and HISA in Kentucky, via electronic means, that these lame horses were certified as fit to run under Illinois and federal law.

158.    The RICO Defendants engaged in this activity despite the fact that midway through the fall 2022 meeting alone, 4 horses had already experienced catastrophic breakdowns. In 2022, a total of 10 racehorses were euthanized or died in the course of their races and training at Hawthorne.

159.    A breakdown refers to a severe injury that occurs during a race or a workout, often involving the horse's musculoskeletal system.

160.    When a breakdown occurs, the horse typically falters or collapses during the race. Depending on the severity of the injury, the horse may need to be euthanized immediately on the track or shortly afterward.

161.    On December 4, 2022, Tuma brought her complaints of the criminal activities to Dr. Mary Scollay ("Scollay"), Chief of Science at HIWU.

162.    Tuma reported several issues:

    a.    First, that her attempts to make pre-race scratches of sick, injured, or lame horses were being reversed by other veterinarians and that she had been told by the RICO Defendants that every horse should "make it to the paddock" regardless of sick or lame status because Hawthorne's field are short horses.[17]

    b.    Second, that when a horse was significantly lame or injured, the Association and

---

[17]    The paddock is the area at a racetrack where horses are staged immediately prior to a race.

> Regulatory veterinarian would offer a "deal" to the horse's trainer in which the horse would be scratched as sick, rather than lame, to avoid placement on the Veterinarian's List; and

> c. Third, that Dr. Tuma had complained to Calderon, who refused to take any action to stop the misconduct and told Tuma, "this is how it's always done."

163.    Scollay referred the matter to Jennifer Durenberger ("Durenberger"), then Director of Equine Safety and Welfare at HISA and Ann McGovern ("McGovern"), HISA's Director of Racetrack Safety.

164.    No action was taken during the remainder of the 2022 meeting to stop the illegal activities.

## VI. Dr. Tuma's Second Set of Protected Activities and Complaints to Government Officials and Defendants' Efforts to Silence Her

165.    Hawthorne's 2023 sole thoroughbred meeting was approved by the IRB, pursuant to the IHRA and consisted of racing 68 days commencing on March 4, 2023, and ending on September 4, 2023.

166.    During the 2023 meeting, Dr. Tuma assessed at least the following 50 horses as lame and unqualified to run:

| Date | Race | Horse Name |
|------|------|------------|
| April 20, 2023 | 4 | Jeff the Lion |
| April 27, 2023 | 6 | Silvera |
| May 7, 2023 | 1 | Superstar Diva |
| May 25, 2023 | 5 | Rare Action Attack |
| June 4, 2023 | 6 | Z u Soon |
| June 4, 2023 | 5 | Andrew the Giant |
| June 7, 2023 | 5 | Ronan |
| June 21, 2023 | 8 | Jeff the Lion |
| June 29, 2023 | 5 | Peach Cobbler |
| June 29, 2023 | 7 | Dark Solution |
| July 6, 2023 | 9 | Flying Cricket |
| April 6, 2023 | 4 | Dastardly Deeds |
| April 6, 2023 | 5 | Fit and Famous |

| April 9, 2023 | 4 | Restoring Hope |
| April 9, 2023 | 6 | Christmas Present |
| April 27, 2023 | 3 | Lavendar Earl |
| May 4, 2023 | 5 | Eye on Dessert |
| May 7, 2023 | 2 | Godsgift |
| May 11, 2023 | 2 | Public Safety* |
| May 11, 2023 | 2 | The Last Fact |
| May 14, 2023 | 1 | Imagine Gold |
| May 14, 2023 | 7 | Power Through |
| May 18, 2023 | 4 | Blame Shifter |
| May 18, 2023 | 5 | Meatloaf's Chance |
| May 18, 2023 | 3 | Egomaniac |
| May 18, 2023 | 7 | West Warpath |
| May 25, 2023 | 2 | Bertrada |
| May 28, 2023 | 2 | Mare's Gunner |
| May 28, 2023 | 5 | Arch Flyer |
| May 28, 2023 | 7 | Bal a Kazoo |
| June 7, 2023 | 2 | Freedom Attack |
| June 7, 2023 | 7 | Noble Creeker |
| June 7, 2023 | 8 | Flying Cricket |
| June 15, 2023 | 6 | Risky Boy |
| June 18, 2023 | 2 | Safe Travels |
| June 18, 2023 | 2 | No Nannette No |
| June 18, 2023 | 4 | Uncle Dick |
| June 18, 2023 | 8 | Blame Shifter |
| June 21, 2023 | 3 | Dastardly Deeds |
| June 22, 2023 | 8 | Play Twenty |
| June 22, 2023 | 1 | Land Mark Deal |
| June 22, 2023 | 7 | Cat Attack |
| June 28, 2023 | 7 | Indio Guapo |
| June 29, 2023 | 1 | Kramden |
| July 5, 2023 | 5 | Follow the Signs |
| July 5, 2023 | 2 | Electric Charge |
| July 5, 2023 | 5 | Star of Kodak |
| July 6, 2023 | 6 | Apollo U Anywhere |
| July 6, 2023 | 8 | Dastardly Deeds |
| July 9, 2023 | 6 | Family Tradition |

167.    Buechler and Calderon agreed to overturn and run at least 48 of Dr. Tuma's lame

assessments.

168.    In doing so, they fraudulently transmitted certifications to the IRB in Illinois and HISA in Kentucky via electronic means that these lame horses were certified as fit to run under Illinois and federal law.

169.    However, under Illinois and federal law, each of these horses were required to have been listed on the State Veterinarian's list and concurrently reported to RICO Defendants Eddy or Kelley for their placement of the horses on the Steward's list and then precluded from racing.  None of RICO Defendants Buechler, Calderon, Eddy or Kelly complied.

170.    During the course of the fall 2022 meeting and the 2023 meeting, Dr. Tuma asked Buechler for a second opinion dozens of times on horses she assessed as lame. However, at no point in the meetings did Buechler ever ask Dr. Tuma for a second opinion on a horse. Dr. Molladous, another Association Veterinarian, who performed pre-race exams when Dr. Tuma or Buechler were absent requested Dr. Tuma's opinion on several occasions.

171.    On March 3, 2023, Marcia Gortowski ("Gortowski"), another State Veterinarian employed by the IRB, in the course of correspondence regarding Dr. Tuma's complaints with Scollay, referred to the excessive number of scratches that had been changed from lame to sick and stated that she "hop[ed] [Calderon] was not part of it" and acknowledged her awareness of the "collective measures to thwart [Dr. Tuma's] scratches."

172.    Acknowledging the stated concerns in Dr. Tuma's complaints of retaliation and foreshadowing Dr. Tuma's forthcoming termination, Gortowski went on to state that she "did not pick up on the number of times scratches were changed….[D]efinitely did not realize that some were changed to sick scratches. That seems worrisome. I am more afraid of a worsening chasm between vets, Hawthorne management, IRB relationships than professional retaliation."

173.    Finally, on March 20, 2023, Dr. Tuma delivered a comprehensive whistleblower letter

to the IRB and HISA. This letter addressed the unheeded complaints of illegal activity, including the false certification by the RICO Defendants of horses as qualified to race, the illegal modifications of her entries in the Track Manager system, and the fraudulent changing of the scratches from lame to sick.

174.    Dr. Tuma's letter was broken down into (3) three categories:

    a.    The unauthorized modification of equine medical records;

    b.    Inappropriate/fraudulent transactions between trainers and veterinarians; and

    c.    The failure to comply with standard operating protocols and procedures.

175.    Dr. Tuma's letter also provided state and federal regulators with specific examples of the names and races of horses who she scratched as lame, but that Buechler and Calderon changed to sick and altered her Track Manager entries. Including:

    a.    Return of Premium on September 25, 2022;

    b.    Naughty Alfred on December 12, 2022; and,

    c.    Two Step Beauty on December 17, 2022.

176.    Dr. Tuma's March 20, 2023 complaint was explicit as to the fraudulent nature of the actions stating, "the documentation submitted to the IRB/HISA cannot continue to be falsified," and that an investigation must ensue to "prevent further inappropriate transactions between trainers and Regulatory Veterinarians."

177.    Dr. Tuma's reporting to the governmental agencies also included concerns of race fixing.

178.    Dr. Tuma reported to Durenberger and other government officials that the running of lame horses may have been used by those with this inside knowledge or hidden ownership interests to place illegal wagers or fix races.

179.    The failure to certify these horses as lame and place them on the Veterinarian's List,

allowed the RICO Defendants to create and potentially benefit from information regarding the condition of the horses in the race that was not known by others, including bettors placing wagers on that race around the country.

180.     The fraudulent certification of horses as sick, as opposed to lame, also resulted in horses illegally being released from the Veterinarian's List prior to the time they were legally qualified to run.

181.     In addition, on at least ten occasions during the 2023 meeting alone, Calderon's and Buechler's overturning of Dr. Tuma's lameness assessment increased the number of horses in the race to the six minimum required, when the proper disqualification of these horses would have left the field below the minimum number allowed to race in Illinois in a wagered race.

182.     These races include: (a) race number five on April 6, 2023; (b) race number four on April 20, 2023; (c) race number five on May 4, 2023; (d) race number two on May 7, 2023; (e) race number two on May 25, 2023; (f) race number six on June 4, 2023; (g) race number six on June 15, 2023; (h) race number seven on June 22, 2203; (i) race number five on June 29, 2023, and (j) race number two on July 5, 2023.

183.     On or around the date Dr. Tuma submitted her comprehensive complaint to the IRB, Miller, who had theretofore never called Dr. Tuma directly on her cell phone, called her a minimum of six times to intimidate her about her lame scratches and to ensure that the maximum number of horses were run.

184.     Further evidencing the goals of the RICO Defendants, in a text exchange on April 6, 2023, between RICO Defendants Miller and Eddy, an IRB state steward charged with ensuring the integrity and fairness of races in Illinois, Eddy stated, "[I] love these handles."

185.     The role of the state stewards in maximizing the number of horses run in furtherance of the scheme was also exposed when Kelley during the Fall 2022 meeting was presented with a list

33

of ten horses to be scratched that day. In response, Kelley stated "I hate seeing those [numbers]."

## VII. The RICO Defendants' Attempts to Further Their Scheme via The Retaliatory Termination of Dr. Tuma

186.    On the morning of July 6, 2023, Dr. Tuma examined "Dastardly Deeds," and assessed the horse as lame due to the exaggerated crossing of the horses' hind limbs. A video of the horse crossing its hind limbs during Dr. Tuma's examination is attached as Exhibit B. *See* ECF Dkt. No. 7.

187.    Calderon, with full knowledge of the horse's lame condition, overturned Dr. Tuma's assessment and permitted the horse to run.

188.    That same day Dr. Tuma sent the video of the lame horse to State Veterinarian Gortowski.

189.    The next day, Calderon learned about this new complaint. Calderon, in retaliation for Dr. Tuma's complaint to Gortowski, and the various other complaints referenced herein, reported to Miller Dr. Tuma's "interference" with the RICO Defendants' scheme, and proceeded to send two illegal and retaliatory emails.

190.    The first was a copy of Dr. Tuma's March 20, 2023 complaint to the IRB, and the second pertained to the aforementioned race from July 6, 2023.

191.    Evidencing Calderon's need to avoid outside detection of their illegal activities, Calderon stated that "[Dr. Tuma] should have sent this request to me [as opposed to Dr. Gortowski]," and that on a previous occasion, at Calderon's request, that Miller had instructed Dr. Tuma to "inform [Calderon], not Gortowski," when she disagreed about an illegal scratch.

192.    Calderon's disclosure of Dr. Tuma's complaints about Hawthorne to Miller, a Hawthorne employee, violated the State Officials and Employees Ethics Act's prohibition on *ex parte* communications, 5 ILCS 430/5-50, and constituted Official Misconduct under Illinois law. *See* 720 ILCS 5/33-3.

193.    On July 12 and 13, 2023 HISA regulators were scheduled to be on site for an

accreditation meeting.

194. In advance of this meeting, the RICO Defendants came to an agreement that to perpetuate the activities of the Enterprise, avoid the potential for further detection, and punish Dr. Tuma for her protected activities, that she would be terminated.

195. On July 9, 2023 Walsh sent a text to Dr. Tuma requesting to meet.

196. Dr. Tuma indicated that she was unavailable that day and could possibly schedule a meeting for the following Wednesday or Thursday, July 12 or 13, 2023.

197. Walsh, under pressure to terminate Dr. Tuma before the regulators arrived, replied that "I prefer meeting before Wednesday."

198. Dr. Tuma met with Walsh via Zoom on July 11, 2023 and was informed that she had been terminated based on the pretext that her termination was a cost cutting measure.

199. Dr. Tuma was terminated (a) in retaliation for her protected activity of disclosing the activities of the RICO Defendants and (b) to ensure that Dr. Tuma could not make any further disclosures regarding the scheme to the federal regulators and impede the illegal activities of the RICO Defendants.

200. Shortly after Dr. Tuma's termination, Miller sent a text to various other RICO Defendants in order to ensure that the illegal activities of the RICO Defendants were concealed should they be uncovered by regulators, or other governmental officials stating:

> I was informed this evening that due to the shorter fields and lack of horses on the backside that it didn't make financial sense to have two pre-race vets for live racing days. Dr. Tuma has been informed by management of this and is currently no longer employed at Hawthorne.

## RICO PREDICATES

201. Each RICO Defendant is a "person" capable of holding legal interest in property within the meaning of 18 U.S.C. § 1961(3).

202. Defendants Hawthorne and the IRB formed an "enterprise," within the meaning of

18 U.S.C. § 1961(4), for the purpose of operating and promoting horseracing within the State of Illinois. Individuals employed by and associated with the members of the Enterprise have worked closely together for several years to oversee horseracing at Hawthorne and throughout Illinois.

203. By virtue of their solicitation and acceptance of wagers across the country and transmission of regulatory information to HISA in Kentucky, the predicate acts of the RICO Defendants have affected interstate commerce.

204. The RICO Defendants, each of whom are persons associated with, or employed by the Enterprise, collectively agreed to conduct, and conducted, the affairs of the Enterprise through a continuing pattern of racketeering activity via numerous instances of wire fraud in violation 18 U.S.C. §1343, operating an illegal gambling business in violation of 18 U.S.C. §1955, and gambling in violation of Illinois law, 720 ILCS 5/28-1.

205. The acts of racketeering by the RICO Defendants in conducting the affairs of the Enterprise were related and have the same or similar purposes, results, participants, victims, and methods of commission.

206. The acts of racketeering by the RICO Defendants, on behalf of the Enterprise, were continuous and consisted of a series of related acts beginning no later than October 2022 and continuing through at least July 2023.

207. The RICO Defendants operated and managed the Enterprise through a series of coordinated actions which included collaboration and communication, via phone calls, meetings, and electronic communications.

## I. Wire Fraud in Violation of 18 U.S.C. §1343

208. A party is guilty of wire fraud under 18 U.S.C. §1343 when:

    a. they have engaged in a scheme to deprive another of money, property or honest services;

    b. they have done so with the intent to defraud;

c. they use wire communications across state lines, including email, fax, or other electronic communications; and,

d. The false or fraudulent pretenses, representations, or promises are material, such that they are capable of influencing the decision of the person or entity being deceived.

**A)** **Altering and Transmitting Fraudulent Entries to State and Federal Regulators – Buechler and Calderon via Track Manager and HISA Portal**

209. RICO Defendants Buechler and Calderon committed wire fraud pursuant to 18 U.S.C. §1343, when they agreed to and engaged in a scheme to defraud bettors and regulators by means of false or fraudulent pretenses.

210. RICO Defendants Buechler and Calderon agreed to and submitted false or altered data regarding the qualifications of horses to run in races at Hawthorne that was intended for and was transmitted electronically to state and federal regulators in Track Manager and the HISA Portal.

211. Specifically, RICO Defendants Buechler and Calderon tampered with Dr. Tuma's "scratch lame" entries in Track Manager and changed them to "racing sound" or "scratch sick." Calderon and Buechler committed these fraudulent acts, at a minimum, on the dates and races listed in ¶¶ 105, 154, 166, 175, and 182.

212. The data was transmitted via online platforms to federal and state regulators in Illinois and Kentucky.

213. They did so willfully in order deceive the regulators and bettors nationwide to induce bettors to wager on these horses, thereby depriving the bettors of their money and increasing the funds obtained by the enterprise, in addition to securing the funds they obtained from their own employment.

**B)** **Altering and Transmitting Fraudulent Software Entries to State and Federal Regulators – RICO Defendants Calderon, Eddy, and Kelley via the State Steward's and Veterinarian's List**

214. RICO Defendants Calderon, Kelley, and Eddy committed wire fraud in violation of

18 U.S.C. §1343, when they agreed to and engaged in a scheme to defraud bettors and regulators by means of false or fraudulent pretenses. Defendants Calderon, Eddy, and Kelley electronically transmitted the State Veterinarian and Steward Lists (and/or periodic updates to them), with false information, while they certified the accuracy of the lists to state and federal regulators. Instead, these lists were intentionally and fraudulently incomplete, as a result of failing to include the horses that were known to be lame and should have been scratched from races.

215.    This data was transmitted via email, text, or online platform to federal and state regulators in Illinois and Kentucky.

216.    These RICO Defendants agreed to and engaged in a pattern of submitting fraudulent entries and did so continuously on the dates listed in ¶¶ 105, 154, 166, 175, and 182.

217.    They did so willfully in order deceive the regulators and bettors nationwide to induce bettors to wager on these horses, thereby depriving the bettors of their money and increasing the funds obtained by the Enterprise, in addition to securing their own employment.

### C)    Fraudulent Entries to Bettors Across the Country – Hawthorne, White, Walsh, and Miller

218.    RICO Defendants Miller, Walsh, White and Hawthorne, committed wire fraud in violation of 18 U.S.C. §1343 when, pursuant to their responsibilities, they agreed to and then intentionally entered the fraudulent racing data described herein containing the names and starting odds of horses qualified to race onto Hawthorne's website, other ADW online betting platforms, Hawthorne's racing broadcast, and via distribution to nationwide syndicated services across the country.

219.    They did so knowing that the horses were not qualified to race.

220.    These RICO Defendants engaged continuously in these acts on including but not limited to the races and dates listed in ¶¶ 105, 154, 166, 175, and 182.

221.    They did so willfully to induce wagers from bettors, thereby depriving the bettors of

their money and increasing the funds obtained by the Enterprise, in addition to securing their own employment.

## II. Operating an Illegal Gambling Business in Violation of 18 U.S.C. §1955 – All RICO Defendants

222. All RICO Defendants, in furtherance of their pattern of racketeering activity, agreed to and knowingly operated an illegal gambling business in violation of 18 U.S.C. §1955.

223. 18 U.S.C. §1955 defines an illegal gambling business as one that:

    a. violates state or local law where it is conducted;

    b. involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of the business; and

    c. has been in operation for more than thirty days or has grossed revenue of $2,000 or more in any single day.

224. Here, in addition to the numerous state law violations of the IHRA and federal violations of HISA rules and regulations alleged above, the RICO Defendants each individually and collectively in furtherance of their pattern of racketeering violated 230 ILCS 5/35 of the IHRA. This statute provides that "[a]ny person holding or conducting any meeting within the State at which racing of horses shall be permitted for any stake, purse or reward or any person or persons aiding, assisting or abetting in the holding or conducting of such meeting where racing is held or conducted contrary to or in violation of any of the provisions and requirements of this Act shall be guilty of a Class 4 felony."

225. The illegal gambling business involved more than five persons, including but not limited to Defendants Walsh, Miller, White, Buechler, Calderon, Kelley, Eddy, Hawthorne and the IRB, who managed, supervised or owned all or part of the illegal gambling business.

226. As further alleged herein, the RICO Defendants' violations of state law under the IHRA and HISA operated for more than thirty days and grossed more than $2,000 on each day where a horse was certified as fit to run but was in fact lame or sick.

III. **Transmitting Information as to Wagers, Betting Odds, or Changes in Betting Odds in Violation of 720 ILCS 5/28-1(a)(11) – Defendants Hawthorne, White, Miller, and Walsh**

227.    Under Illinois law, "a person commits the offense of gambling when he or she… knowingly transmits information as to wagers, betting odds, or changes in betting odds by telephone, telegraph, radio, semaphore or similar means." 720 ILCS 5/28-1(a)(11).

228.    A person will not be convicted of gambling if he or she is a participant in pari-mutuel gambling, "as authorized by the law of [Illinois]." 720 ILCS 5/28-1(b)(11).

229.    Under Illinois law, a second or subsequent conviction under 720 ILCS 5/28-1(a)(11) is a Class 4 felony, which is punishable by imprisonment for more than one year.

230.    These RICO Defendants agreed to and then continuously ran races at Hawthorne, in a manner that was not authorized by state law, by running sick or lame horses that were not eligible to run on the dates listed in ¶¶ 105, 154, 166, 175, and 182.

231.    Further, these RICO Defendants agreed to and then ran races that were not authorized by state law on at least the dates listed in ¶ 182, when Hawthorne allowed wagering races to proceed that did not meet the minimum number of entries required by state law.

232.    Despite these races being run illegally, Defendants Hawthorne, White, Miller, and Walsh, agreed to and then transmitted betting odds information to bettors in Illinois and around the country via Hawthorne's website, other ADW online betting platforms, Hawthorne's racing broadcast, and distribution to nationwide syndicated services across the country.

IV. **Retaliation in Violation of 18 U.S.C. § 1513(e) – Defendants Hawthorne, White, Miller, Walsh, and Calderon**

233.    Under federal law, "[w]hoever knowingly, with intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense," commits a predicate act under RICO. 18 U.S.C. §

1513(e).

234.     Employees of HIWU are "law enforcement officers" because HIWU engages in the "prevention, detection, investigation, or prosecution" of federal offenses on behalf of the federal government. *See* 15 U.S.C. § 1515(a)(4). Specifically, HIWU has authority to investigate and refer violations of HISA rules that include criminal acts for prosecution.

235.     Dr. Tuma provided information to a law enforcement officer relating to the commission of a federal offense when she reported the commission or possible commission of federal offenses including wire fraud and operation of an illegal gambling business to HIWU officials.

236.     In retaliation for Dr. Tuma's protected activity and to cease any further attempts by Tuma to impede their illegal actions, these RICO Defendants interfered with, agreed to, then terminated, Dr. Tuma's employment with Hawthorne.

## COUNT I - RICO § 1962(a)

237.     The allegations above are incorporated herein by reference.

238.     This Count is against Count I RICO Defendants, Hawthorne, Miller, Walsh, White, and Buechler (the "Count I RICO Defendants") pursuant to 18 U.S.C. § 1964.

239.     Defendants Hawthorne and the IRB constitute an association-in-fact enterprise engaged in and whose activities affect interstate commerce.

240.     The Count I RICO Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise. Specifically, the Count I Defendants used the income to pay Hawthorne's operational costs, including the Count I Defendants' salaries; to pay Hawthorne's share of the various funds listed in ¶ 51, and to fund Hawthorne's new racino; and to pay themselves out of the illegal proceeds of the Enterprise that was fraudulently obtained from wagers made by bettors across the country.

241.     To fraudulently obtain wagers and use the funds, the Count I RICO Defendants

engaged in a pattern of racketeering activity that included:

      a.   wire fraud in violation of 18 U.S.C. §1343;

      b.  operating an illegal gambling business in violation of 18 U.S.C. §1955; and

      c.  transmitting information as to wagers, betting odds, or changes in betting odds in violation of 720 ILCS 5/28-1(b)(11).

242. These acts, as set forth above, constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

243. As a direct and proximate result of the Count I RICO Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiff Dr. Tuma has been injured in her business and property by the RICO Defendants. In furtherance of the Enterprise, the RICO Defendants terminated Tuma in order to cease any further attempts by Tuma to impede their illegal actions, and retaliated against her by depriving her of her employment, and the past and future funds she obtained therefrom, because she complained to HISA about the RICO Defendants' violations of state and federal law. In addition, she has suffered severe emotional distress resulting in physical injuries and harm to her professional reputation.

244. Based on the allegations contained herein, including but not limited to (a) the RICO Defendants' continuous pattern of predicate acts, (b) their notice of Tuma's complaints to the RICO Defendants' themselves and government regulators, and (c) their collective agreement to terminate Dr. Tuma in furtherance of their conspiracy, these damages were a foreseeable consequence of the activities of the RICO Defendants.

## COUNT II - RICO § 1962(c)

245. The allegations above are incorporated herein by reference.

246. This Count is against Count II RICO Defendants Hawthorne, Miller, Walsh, White, Buechler, Eddy, Kelley, and Calderon (the "Count II RICO Defendants") pursuant to 18 U.S.C. § 1964.

247.     Defendants Hawthorne and the IRB constitute an association-in-fact enterprise engaged in and whose activities affect interstate commerce.

248.     The Count II RICO Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity as described above.

249.     The Count II RICO Defendants engaged in a pattern of racketeering activity that included:

    a.   wire fraud in violation of 18 U.S.C. §1343;

    b.   operating an illegal gambling business in violation of 18 U.S.C. §1955;

    c.   transmitting information as to wagers, betting odds, or changes in betting odds in violation of 720 ILCS 5/28-1(a)(11); and

    d.   retaliation in violation of 18 U.S.C. § 1513.

250.     These acts, as set forth, above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

251.     The Count II RICO Defendants have directly and indirectly conducted and participated in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

252.     As a direct and proximate result of the Count II RICO Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff, Dr. Tuma, has been injured in her business and property by the RICO Defendants. In furtherance of the Enterprise, the RICO Defendants terminated Tuma to cease any further attempts by Tuma to impede their illegal actions and retaliated against her when she was deprived of her employment, and the past and future funds she obtained therefrom, because Dr. Tuma complained to HISA about the RICO Defendants' violations of state and federal law. In addition, she has suffered severe emotional distress resulting in physical injuries and harm to her professional reputation.

253.     Based on the allegations contained herein, including but not limited to (a) the RICO

Defendants' continuous pattern of predicate acts, (b) their notice of Tuma's complaints to the RICO Defendants' themselves and government regulators, and (c) their collective actions to terminate Dr. Tuma, these damages were a foreseeable consequence of the activities of the RICO Defendants.

## COUNT III - RICO § 1962(b)

254.    The allegations above are incorporated herein by reference.

255.    This Count is against Defendants Hawthorne, Miller, Walsh, White, Buechler, Calderon, Eddy and Kelley (the "Count III RICO Defendants") pursuant to 18 U.S.C. § 1964.

256.    Defendants Hawthorne and the IRB constitute an association-in-fact enterprise engaged in and whose activities affect interstate commerce.

257.    The Count III RICO Defendants are employed by or associated with the Enterprise.

258.    The Count III RICO Defendants acquired and maintained interests in and control of the Enterprise through a pattern of racketeering activity, by using the funds obtained from the Enterprise, and their pattern of racketeering activity, to pay sums owed to the state and various municipalities to maintain their association license and their horse racing operations.

259.    The Count III RICO Defendants maintained interests in the control of the Enterprise and of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purposes as described above.

260.    The Count III RICO Defendant's engaged in a pattern of racketeering activity including:

    a.   wire fraud in violation of 18 U.S.C. §1343;

    b.   operating an illegal gambling business in violation of 18 U.S.C. §1955;

    c.   transmitting information as to wagers, betting odds, or changes in betting odds in violation of 720 ILCS 5/28-1(b)(11); and

    d.   retaliation in violation of 18 U.S.C. § 1513.

261.    These acts, as set forth above, constitute a pattern of racketeering activity pursuant to

18 U.S.C. § 1961(5).

262.     The Count III RICO Defendants have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

263.     As a direct and proximate result of the Count III RICO Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff Dr. Tuma has been injured in her business and property by the RICO Defendants. In furtherance of the Enterprise, the RICO Defendants terminated Tuma to cease any further attempts by Tuma to impede their illegal actions and retaliated against her when she was deprived of her employment, and the past and future funds she obtained therefrom, because she complained to HISA about the RICO Defendants' violations of state and federal law. In addition, she has suffered severe emotional distress resulting in physical injuries and harm to her professional reputation.

264.     Based on the allegations contained herein, including but not limited to (a) the RICO Defendants' continuous pattern of predicate acts, (b) their notice of Tuma's complaints to the RICO Defendants' themselves and government regulators, and (c) their collective actions to terminate Dr. Tuma, these damages were a foreseeable consequence of the activities of the Enterprise.

## COUNT IV - RICO § 1962(d)

265.     The allegations above are incorporated herein by reference.

266.     This Count is against Defendants Hawthorne, Miller, Walsh, White, Buechler, Calderon, Eddy and Kelley (the "Count IV RICO Defendants") pursuant to 18 U.S.C. § 1964.

267.     The Count IV RICO Defendants are employed by or associated with the Enterprise.

268.     As set forth above, the Count IV Defendants agreed and conspired to violate 18 U.S.C. § 1962 (a), (b) and (c) when they:

> a.   submitted fraudulent veterinary records to the IRB and HISA using the Track Manager software on the dates listed in ¶¶ 105, 154, 166, 175, and 182;

b. supervised or participated in the running of illegal horse races;

c. paid themselves out of the proceeds of the Enterprise that were fraudulently obtained from wagers made by bettors across the country and used the funds to maintain their employment;

d. intentionally defrauded bettors and state and federal regulators by withholding information regarding the injury status of horses; and

e. acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity by using the funds obtained from the enterprise and their pattern of racketeering activity to pay sums owed to the state and various municipalities to maintain their association license and their horse racing operations.

269. The Count RICO IV Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity. The Count IV RICO Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

270. The Count IV RICO Defendants engaged in a pattern of racketeering activity including:

a. wire fraud in violation of 18 U.S.C. §1343;

b. operating an illegal gambling business in violation of 18 U.S.C. §1955;

c. transmitting information as to wagers, betting odds, or changes in betting odds in violation of 720 ILCS 5/28-1(b)(11); and

d. retaliation in violation of 18 U.S.C. § 1513.

271. These acts, as set forth above, constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

272.     As a direct and proximate result of the Count IV Defendants' racketeering activities and violations of 18 U.S.C. § 1962(d), Plaintiff Dr. Tuma has been injured in her business and property by the RICO Defendants. In furtherance of the Enterprise, the RICO Defendants terminated Tuma in retaliation for her complaints to HISA about the RICO Defendants' violations of state and federal law and to cease any further attempts by Tuma to impede their illegal actions. Dr. Tuma was deprived of her employment, and the past and future funds she obtained therefrom, as a result of the RICO Defendants' racketeering activities. In addition, she has suffered severe emotional distress resulting in physical injuries and harm to her professional reputation.

273.     Based on the allegations contained herein, including but not limited to (a) the RICO Defendants' continuous pattern of predicate acts, (b) their notice of Tuma's complaints to the RICO Defendants' and government regulators, and (c) their collective agreement to terminate Dr. Tuma, these damages were a foreseeable consequence of the activities of the Enterprise.

**COUNT V- ILLINOIS WHISTLEBLOWER ACT**

274.     The allegations above are incorporated herein by reference.

275.     This Count is against Defendants Hawthorne, Miller, Walsh, Calderon, and the IRB (the "Count V Defendants").

276.     The Illinois Whistleblower Act prohibits an employer from retaliating against an employee for "disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of State or federal law, rule, or regulation." 740 ILCS 174/15.

277.     The Count V Defendants are "employers" as defined by the Act. 740 ILCS 174/5.

278.     Plaintiff was an employee of the Count V Defendants as defined by the Act. *Id.*

279.     On March 20, 2023, Plaintiff disclosed to the IRB and HISA that the Defendants were engaged in a scheme of submitting false veterinary records in order to allow sick and lame horses to

run races. Plaintiff reasonably believed that this conduct violated state and federal laws including, but not limited to the Illinois Horse Racing Act, 230 ILCS 5/1 *et seq.*

280.    On July 7, 2023, Calderon informed Hawthorne of Dr. Tuma's complaint to the IRB and HISA.

281.    The Count V Defendants terminated Dr. Tuma's employment on July 11, 2023, a mere four days later, in retaliation for her protected activity in violation of 740 ILCS 174/15.

282.    As a direct result of the retaliatory discharge, Plaintiff sustained suffered loss of income, benefits, career opportunities, humiliation, and emotional distress.

## COUNT VI – ILLINOIS WHISTLEBLOWER ACT

283.    The allegations of above are incorporated herein by reference.

284.    This Count is against Defendants Hawthorne and the IRB (the "Count VI Defendants").

285.    The Illinois Whistleblower Act prohibits an employer from retaliating against an employee for "refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 ILCS 174/20.

286.    Defendants Hawthorne and IRB are "employers" as defined by the Act. 740 ILCS 174/5.

287.    Plaintiff was an employee of Defendants Hawthorne and IRB as defined by the Act. *Id.*

288.    As described above, Dr. Tuma refused to participate in activity that would result in a violation of State or federal law, rule, or regulation including, but not limited to the Illinois Horse Racing Act, 230 ILCS 5/1 *et seq*, when she refused, on multiple occasions, to participate in an illegal scheme to submit false veterinary records to state and federal regulators.

289.    Plaintiff's employment was terminated on July 11, 2023, in retaliation for refusing to

48

participate in the illegal conduct, in violation of 740 ILCS 174/20.

290.    As a direct result of Defendants' retaliatory discharge, Plaintiff sustained suffered loss of income, benefits, career opportunities, humiliation, and emotional distress.

## COUNT VII – ILLINOIS COMMON LAW RETALIATORY DISCHARGE

291.    The allegations above are incorporated herein by reference.

292.    This count is against Defendants Hawthorne and the IRB ("Count VII Defendants").

293.    Illinois law permits an employee to recover damages for retaliatory discharge from his former employer, if the former employer discharges the employee in retaliation for reporting conduct the employee reasonably believes to be illegal or against public policy to the employer, and the discharge was in contravention of a clearly mandated public policy.

294.    The Count VII Defendants discharged Plaintiff in retaliation for reporting activity that she reasonably believed violated state and federal laws including, but not limited to the Illinois Horse Racing Act, 230 ILCS 5/1 *et seq*.

295.    Defendants' violations of the Illinois Horse Racing Act are against the explicit public policy of Illinois, as stated in the Illinois Horse Racing Act. 230 ILCS 5/1.2(f).

296.    As a result of Defendant's retaliatory discharge, Plaintiff suffered loss of income, benefits, career opportunities, humiliation, and emotional distress.

## COUNT VIII – ILLINOIS CIVIL CONSPIRACY

297.    The allegations of above are incorporated herein by reference.

298.    This Count is against all Defendants (the "Count VIII Defendants").

299.    Illinois law permits an aggrieved party to recover damages for violations of the common law tort of civil conspiracy when there is an agreement between two or more persons to participate in an unlawful act and an injury is caused by an unlawful overt act performed by one of the parties pursuant to and in furtherance of the common scheme.

300. As described above, the Count VIII Defendants agreed to and participated in numerous unlawful acts in furtherance of their conspiracy, including but not limited to:

    a. wire fraud in violation of 18 U.S.C. §1343;

    b. operating an illegal gambling business in violation of 18 U.S.C. §1955; and

    c. transmitting information as to wagers, betting odds, or changes in betting odds in violation of 720 ILCS 5/28-1(b)(11).

301. As a direct result of the Count VIII Defendants' unlawful acts, Plaintiff sustained suffered loss of income, benefits, career opportunities, humiliation, and emotional distress.

302. WHEREFORE, Plaintiff requests that this Court enter judgment against the Defendants for actual damages, compensatory damages, punitive damages, treble damages, attorney's fees and costs, and any other relief deemed proper by this Court.

## JURY DEMAND

Plaintiff demands trial by jury on all claims properly triable by a jury.

The Garfinkel Group, LLC
The CIVITAS
701 N. Milwaukee Avenue
Chicago, IL 60642
Haskell Garfinkel (IARDC No. 6274971)
haskell@garfinkelgroup.com
Max Barack (IARDC No. 6312302)
max@garfinkelgroup.com
Wayne Garris (IARDC No. 6328048)
wayne@garfinkelgroup.com
(312) 736-7991

Respectfully submitted,

    */s/ Haskell S. Garfinkel*

_____
One of the Plaintiff's Attorneys