**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Christine Tuma, | |
| Plaintiff, | Case No. 24-cv-8307 |
| v. | Hon. Jeffrey I. Cummings |
| Hawthorne Race Course, Inc.; Jim Miller; John Walsh; Dave White; Illinois Racing Board; Dawn Folker-Calderon; Beth Buechler; Thomas Kelley; and John Eddy, | Magistrate Judge Jeffrey T. Gilbert |
| Defendants. | |

**STATE DEFENDANTS' MEMORANDUM IN SUPPORT
OF THEIR MOTION TO DISMISS AMENDED COMPLAINT**

R. Douglas Rees
Michael T. Dierkes
Office of the Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
Phone: (312) 814-3498/3672
*richard.rees@ilag.gov*
*michael.dierkes@ilag.gov*

Defendants ILLINOIS RACING BOARD,
DAWN FOLKER-CALDERON, THOMAS
KELLEY, and JOHN EDDY

KWAME RAOUL
Illinois Attorney General

Dated: January 31, 2025
(refiled with leave March 3, 2025)

# TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Background ........................................................................................................................... 2

   Hawthorne's Termination of Tuma's Employment ........................................................ 3

   Tuma's Complaint ........................................................................................................... 4

      Tuma's RICO Claims ................................................................................................ 4

      Alleged Wire Fraud .................................................................................................. 6

      Alleged Illegal Gambling ......................................................................................... 7

      Tuma's State-Law Claims ........................................................................................ 8

Legal Standard ..................................................................................................................... 9

Argument ............................................................................................................................ 10

   I.    Tuma Fails To State a Plausible RICO Claim Against Any State Defendant. ................. 10

      A.    Tuma's RICO claims for damages from wrongful termination of her employment must be dismissed because they were not caused "by reason of" a RICO violation. ........... 10

      B.    Tuma's alleged personal injuries are not "injury to business or property" under section 1964(c). ....................................................................................................... 15

      C.    Tuma does not plausibly allege that any State Defendant committed a "pattern" of racketeering activity. ........................................................................................... 15

      D.    Tuma does not allege that any State Defendant operated an "enterprise" distinct from their own business activities. .......................................................................... 19

      E.    Tuma does not have standing to pursue a section 1962(b) claim, nor does she plausibly show that any individual State Defendant violated section 1962(b) by acquiring an interest in an enterprise through a pattern of racketeering activity. ........................... 22

      F.    Tuma fails to plausibly allege that any State Defendant engaged in a RICO conspiracy in violation of section 1962(d). ................................................................. 23

      G.    Tuma's RICO claims against the State Defendants are barred by qualified immunity. 25

   II.   Tuma's state-law whistleblower, retaliation, and conspiracy claims against the State Defendants are barred by state sovereign immunity and fail to state a viable claim against any State Defendant. ...................................................................................................... 26

      A.    The Court should decline to exercise supplemental jurisdiction over Tuma's state- law claims. ........................................................................................................... 26

      B.    Tuma's state-law claims against the State Defendants are barred by the Eleventh Amendment and state sovereign immunity ................................................................ 27

         1.    The Illinois Racing Board is immune from suit under the Eleventh Amendment and the State Lawsuit Immunity Act. ......................................................................... 27

         2.    Tuma's state-law claims against the individual State Defendants are also barred by

i

the State Sovereign Immunity Act. ............................................................................ 29

C.   Tuma does not state a viable state-law claim against any State Defendant. ................ 31

1.   Whistleblower Act (Illinois Racing Board and Folker-Calderon) ........................... 31

2.   Common Law Retaliatory Discharge (Illinois Racing Board) .................................. 33

3.   Illinois Civil Conspiracy (all defendants) ................................................................. 34

Conclusion ................................................................................................................................. 34

# TABLE OF AUTHORITIES

## Cases

*Aguero v. Univ. of Ill.*, No. 16-cv-2298, 2017 U.S. Dist. LEXIS at *21–23 (C.D. Ill. Mar. 30, 2017) .......................................................................................................................... 28

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006) ....................................................... 10

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ............................................................................ 25

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ................................................................................... 9

*Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ................................................. 10

Beck v. Prupis, 529 U.S. 494, 505 (2000) ............................................................................ 11, 23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ................................................................... 9

*Benning v. Bd. of Regents of Regency Universities*, 928 F. 2d 775, 779 (7th Cir. 1991) ............ 28

*Boyle v. United States*, 556 U.S. 938, 946 (2009) ....................................................................... 20

*Brouwer v. Raffensperger, Hughes & Co.*, 199 f.3d 961, 967 (7th Cir. 2000) ............................. 23

*Buckner v. Atlantic Plant Maintenance*, 182 Ill. 2d 12, 21 (1998) ............................................. 33

*Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015) ............................................................... 26

*Butler v. Ill. Dep't Transp.*, 533 F. Supp. 2d 821, 826–27 (N.D. Ill. 2008) ............................... 29

*Cole v. Bd. of Trs. of N. Ill. Univ.*, 38 F. Supp. 925, 933 (N.D. Ill. 2014) ................................. 30

*Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019) ......................... 9

*Culp v. Flores*, 454 F. Supp. 3d 764, 770–71 (N.D. Ill. 2020) ................................................... 30

*Currie v. Lao*, 148 Ill. 2d 151 (1992)........................................................................................... 29

*DeGuelle v. Camilli*, 664 F.3d 192, 200–202 (7th Cir. 2011) ..................................................... 11

*Dibble v. Quinn*, 793 F.3d 803, 807–08 (7th Cir. 2015)............................................................. 25

*Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062–63 (2d Cir. 1996)........................................ 22

*Divane v. Nw. Univ.*, 953 F.3d 980, 987 (7th Cir. 2020) ............................................................... 9

*Domanus v. Locke Lord LLP*, 847 F.3d 459, 479–82 (7th Cir. 2017) ................................... 23, 24

*Edwards v. Ill. Dep't of Fin. & Prof'l Regulation*, No. 12-cv-371, 2014 U.S. Dist. LEXIS 40725, at *25–27 (N.D. Ill. Mar. 27, 2014) .......................................................................... 29

*El Omari v. Buchanan*, No. 20 Civ. 2601, 2021 U.S. Dist. LEXIS 236933 at *16 (S.D.N.Y. Dec. 10, 2021) .................................................................................................................. 12

*Fuqa v. SVOX AG*, 754 F.3d 397, 401 (7th Cir. 2014) ............................................................... 27

*Gallardo v. Marstiller*, 596 420, 445 (2022) .............................................................................. 12

*Grant v. Kabaker*, No. 16-cv-3245, 2016 U.S. Dist. LEXIS 182371 at *7 (C.D. Ill. Oct. 12, 2016) ........................................................................................................................................ 29

*Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1068 (2020) ......................................................... 9

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240–41 (1989) ................................. 16, 19

*Harris v. Illinois*, 753 F. Supp. 2d 734, 742 (N.D. Ill. 2010) .............................................. 28, 32

HISA v. Nat'l Horsemen's Benevolent & Protective Ass'n, No. 24A287, 2024 U.S. LEXIS 4417 (U.S. Oct. 28, 2024) ............................................................................................................. 3

*Holmes v. Securities Investor Protection Corp.*, 403 U.S. 258, 268–69 (1992).......................... 10

*Ill. Clean Energy Cmty. Found v. Filan*, No. 03-cv-7596, 2004 U.S. Dist. LEXIS 7615, at *11–12 (N.D. Ill. Apr. 29, 2004) ................................................................................................. 28

*IWOI, LLC v. Monaco Coach Corp.*, 890 F. Supp. 2d 965, 970–71 (N.D. Ill. 2012).................. 26

*Jennings v. Auto Meter Prods.*, 495 F.3d 466, 474–75 (7th Cir. 2007)....................................... 17

*Johnson v. Oystacher*, No. 15-cv-2263, 2018 U.S. Dist. LEXIS 180274, at *16–17 (N.D. Ill. Oct.

22, 2018) ............................................................................................................... 23

*Key Outdoor Inc. v. City of Galesburg*, 327 F.3d 549, 550–51 (7th Cir. 2003) ........................... 27

*LeRoy v. Ill. Racing Bd.*, No. 89-cv-3433, 1992 U.S. Dist. LEXIS 10241, at *21 (N.D. Ill. Jul. 13, 1992) ......................................................................................................... 27, 28

*McCauley v. City of Chicago*, 671 F.3d 611, 616–17 (7th Cir. 2011) ........................................... 9

*McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 887 (7th Cir. 2012) ...................................... 9

*Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 341–44 (7th Cir. 2019) ................................. 17, 19

*Meyer v. Dep't of Pub. Aid*, 392 Ill. App. 3d 31, 34 (3d Dist. 2009) .......................................... 28

*Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1024 (7th Cir. 1992) ......................................... 17

*Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986) ............................................. 16

*Mullins v. Evans*, 2021 Ill. App. (1st) 191962 ....................................................... 29, 30, 31, 32

*Murphy v. Smith*, 844 F.3d 655 (7th Cir. 2016) ......................................................................... 30

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 872, 888–89 (5th Cir. 2022) ......................................................................................................................... 3

Nat'l Horsemen's Benevolent & Protective Ass'n v. Black, 107 F.4th 415, 421 (5th Cir. 2024) .. 3, 13

*Neitske v. Williams*, 490 U.S. 319, 326 (1989) ............................................................................ 9

NYNEX Corp. v. Discon, Inc., 525 U.S. 128 (1998) ................................................................... 22

*Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023) ............................................... 3, 13

*Parker v. Ill. Human Rights Comm'n*, No. 12 C 8275, 2013 U.S. Dist. LEXIS 153881, at *31 (N.D. Ill. Oct. 25, 2013) ....................................................................................................... 32

*Parmar v. Madigan*, 2018 IL 122265; 106 N.E.2d 1004, 1010 (Ill. 2018) ................................. 30

*Patton v. Rhee*, No. 20-cv-76, 2022 U.S. Dist. LEXIS 52031, at *12–13 (N.D. Ill. Mar. 23, 2022) .......................................................................................................................................... 32

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) ........................................................................ 25

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ...................................... 28

*Penny v. Lincoln's Challenge Acad.*, No. 17-cv-2232, 2018 U.S. Dist. Lexis 247950, at *12–15 (C.D. Ill. Aug. 20, 2018) ....................................................................................................... 28

*Phelps v. Ill. Dep't of Corr.*, No. 22 C 932, 2023 U.S. Dist. LEXIS 103819, at *26–27 (N.D. Ill. Jun. 15, 2023) ...................................................................................................................... 30

*Price v. Vill. of Homewood*, No. 24-1896, 2024 U.S. App. LEXIS 26086, at * 4 (7th Cir. Oct. 16, 2024) ..................................................................................................................................... 15

*Reichle v. Howards*, 566 U.S. 658, 664 (2012) ........................................................................ 25

*Reves v. Ernst & Young*, 507 U.S. 170, 178–79 (1993) ............................................................ 20

*Roberts v. Bd. of Trs. Of Cmty. Coll. Dist. No. 508*, 2019 IL 123594 ....................................... 34

*Roger Whitmore's Auto Servs., Inc. v. Lake Cnty.*, 424 F.3d 659, 673 (7th Cir. 2005) .......... 16, 17

*Ryder v. Hyles*, 27 F.4th 1253, 1257 (7th Cir. 2022) ................................................................ 15

*Salinas v. United States*,  522 U.S. 52, 65 (1997) ..................................................................... 23

*Sciarrone v. Amrich*, No. 19-cv-4584, 2020 U.S. Dist. LEXIS 97258  at *11 (N.D. Ill. June 3, 2020) ..................................................................................................................................... 12

*Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017) ................................................................. 25

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 493–99 (1985) .................................................. 10

*Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010) ................................................... 9

*T.S. v. Cnty. of Cook*, 67 F.4th 884,  894 (7th Cir. 2023) ........................................................ 30

*United Food and Commercial Workers Unions and Employers Midwest health Benefits Fund v.*

iv

*Walgreen Co.*, 719 F.3d 849, 853–54 (7th Cir. 2013) ............................................................ 20

*United States ex rel. Lusby v. Rolls-Royce Corp*., 570 F.3d 849, 853 (7th Cir. 2009) ................ 10

*United States v. Alvarez-Sanchez*, 411 U.S. 350, 356–58 (1994) .......................................... 12

United States v. Skrmetti, 144 S. Ct. 2679 (June 24, 2024) .................................................. 3

*Vicom, Inc. v. Harbridge Merchant Servs.*, 20 F.3d 771, 782 (7th Cir. 1994) ............ 17, 19

*Welch v. Ill. Sup. Ct.*, 322 Ill. App. 3d 345, 351 (3d Dist. 2001) ......................................... 29

*Wheeler v. Piazza*, 364 F. Supp. 3d 870, 885–86 (N.D. Ill. 2019) ...................................... 30

*Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) ...................................................... 3

*Wozniak v. Conry*, 288 Ill. App. 3d 129, 133 (4th Dist. 1997) ........................................... 31

*Xinos v. Kappos*, 270 F. Supp. 2d 1027, 1032 (N.D. Ill. 2003) ........................................... 22

## Statutes

15 U.S.C. § 3052 .............................................................................................................. 13

15 U.S.C. § 3052(a) .................................................................................................... 3, 13

15 U.S.C. § 3054(e)(1)(A) ................................................................................................ 14

15 U.S.C. § 3054(e)(1)(B) ................................................................................................ 14

18 U.S.C. § 1513(e) ................................................................................................ 11, 12, 14

18 U.S.C. § 1961(4) .......................................................................................................... 20

18 U.S.C. § 1962(a) ...................................................................................................... 5, 6

18 U.S.C. § 1962(b) ................................................................................................ 6, 22, 23

18 U.S.C. § 1962(c) ................................................................................................ 5, 6, 20

18 U.S.C. § 1962(d) ...................................................................................................... 6, 23

18 U.S.C. § 1964(c) .......................................................................................................... 10

18 U.S.C. § 3231 .............................................................................................................. 14

230 ILCS 5/1 ...................................................................................................................... 3

230 ILCS 5/14a .................................................................................................................. 14

230 ILCS 5/15 .................................................................................................................... 14

230 ILCS 5/2 ...................................................................................................................... 14

230 ILCS 5/34 .................................................................................................................... 14

230 ILCS 5/45 .................................................................................................................... 14

230 ILCS 5/9(j) ................................................................................................................... 34

28 U.S.C. § 1367(c) .......................................................................................................... 27

50 ILCS 705/2 .................................................................................................................... 12

50 ILCS 712/5 .................................................................................................................... 12

725 ILCS 167/5 .................................................................................................................. 13

725 ILCS 5/107-4 ............................................................................................................... 12

740 ILCS 174/15 ............................................................................................................ 8, 32

740 ILCS 174/20.1 ............................................................................................................. 33

740 ILCS 174/5 ............................................................................................................. 32, 33

745 ILCS 5/1 ...................................................................................................................... 29

Pub. L. No. 107-204, § 1107, 116 Stat. 745, 802–03 ....................................................... 11

## Other Authorities

*https://hisaus.org/about-us#our-mission* .......................................................................... 3

https://www.drugfreesport.com/about-us/ ........................................................................ 14

*https://www.hiwu.org/about* ........................................................................................... 3, 14

**Federal Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 9
Fed. R. Civ. P. 8 ...................................................................................................... 10
Fed. R. Civ. P. 9(b) ........................................................................................... 10, 18

**Administrative Rules**

11 Ill. Admin. Code § 605.10…………………………………………………………..6
11 Ill. Admin. Code § 605.20………………………………………………………6, 21
11 Ill. Admin. Code § 605.30…………………………………………………………... 21
11 Ill. Admin. Code § 1402.30…………………………………………………………21
11 Ill. Admin. Code § 1402.50…………………………………………………………21
11 Ill. Admin. Code § 1402.60…………………………………………………………21
11 Ill. Admin. Code § 1402.165…………………………………………………………21

vi

**Introduction**

Plaintiff Christine Tuma, a veterinarian formerly employed by Hawthorne Race Course, Inc., claims Hawthorne wrongfully terminated her employment as a Hawthorne "association" veterinarian after she blew the whistle on what she believed to be improper practices by individuals from Hawthorne and the Illinois Racing Board that purportedly allowed unsound horses to race at Hawthorne for the purpose of increasing parimutuel betting there. Not content to bring her wrongful termination claims against Hawthorne in state court where they belong, Tuma has (now twice) tried to fashion a federal RICO case by alleging violations of every substantive provision of the Racketeer Influenced and Corrupt Organization Act: section 1962(a), which prohibits the *use or investment of income* derived from a pattern of racketeering activity; section 1962(b), which prohibits the *acquisition or maintenance of an interest in or control* over an enterprise through a pattern of racketeering activity; section 1962(c), which prohibits the *operation or management* of an enterprise through a pattern of racketeering activity; and 1962(d), which prohibits *participation in a conspiracy*, that, if completed, would result in a violation of sections 1962(a), (b), or (c). Neither section fits the bill here, for multiple reasons, including because Tuma's claimed injury—*from the alleged wrongful termination of Tuma's employment,* unrelated to any complaint *to a federal law enforcement officer* about a *federal offense*—is not a cognizable injury "by reason of" RICO activity. This dooms her civil RICO claims from the jump. Tuma's RICO claims also run afoul of other basic RICO pleading requirements, including the failure to plausibly allege how any State Defendant engaged in a "pattern of racketeering" or participated in a RICO "enterprise" apart from conducting their day-to-day jobs for the Illinois Racing Board ("Racing Board" or "IRB"). Tuma's RICO claims against the State Defendants are also barred on immunity grounds.

The Court should dismiss Tuma's RICO claims and refuse to exercise supplemental

1

jurisdiction over her state-law claims. If the Court considers the state-law claims against the Illinois Racing Board and the three named state employees based on their work for the Racing Board—"state veterinarian" Dawn Folker-Calderon and alleged "stewards" Thomas Kelley and John Eddy (collectively, the "State Defendants")—it should dismiss them because they are barred by sovereign immunity and fail to state a claim, including because neither the Racing Board nor state veterinarian Folker-Calderon was Tuma's "employer" or responsible for Hawthorne's termination of her Hawthorne employment.

## Background

Tuma's complaint focuses on 16 race days during Hawthorne's 42-day fall 2022 race meeting and 22 race days during Hawthorne's 68-day 2023 race meeting, culminating in Hawthorne's termination of her employment as a Hawthorne veterinarian on July 11, 2023. ECF 39, ¶¶ 141, 154, 165–66, 175, 198. Reduced to its essence, Tuma contends that Hawthorne terminated her employment as a Hawthorne veterinarian on July 11, 2023, in retaliation for her raising complaints that other veterinarians (Hawthorne veterinarian Beth Buechler and state regulatory veterinarian Dawn Folker-Calderon) were reversing her assessments that horses entered on certain days during the Fall 2022 and 2023 race meetings were too lame to race. ¶ 199.

Tuma contends she first raised her complaints on December 4, 2022, when she told the "Chief of Science" for a private group called the Horseracing Integrity & Welfare Unit ("HIWU") that her pre-race scratches were being reversed by "other veterinarians" who allegedly allowed lame injured horses to be listed as sick instead of lame. ECF 39 ¶¶ 161–62. Tuma followed up on March 20, 2023, by sending an email expressing "concerns" about three "broad infringements/potential violations": (1) alleged modifications of equine medical records without the knowledge or consent of the veterinarian establishing the record (Tuma); (2) alleged

"inappropriate/fraudulent transactions" between trainers and an unidentified "Regulatory Veterinarian"; and (3) an alleged "[f]ailure to comply with standard operating protocol and procedures." *Id.* ¶¶ 173–78; *see also* Tuma's March 20, 2023 email, submitted here as Exhibit 1.[1]

Tuma sent her March 20, 2023 email to four individuals at the Illinois Racing Board, the Illinois agency charged with supporting and ensuring public confidence in horse racing in Illinois under the Illinois Horse Racing Act of 1975, 230 ILCS 5/1, *et seq.*; one individual at the Horseracing Integrity and Safety Authority ("HISA"), a private nonprofit corporation that operates under the auspices of the Federal Trade Commission for the purpose of developing and implementing an anti-doping and medication control and racetrack safety program for "covered horses," which include thoroughbred horses that race at Hawthorne, *see* 15 U.S.C. § 3052(a); and one individual at HIWU, which, as noted above, is another private entity established to administer the rules and enforce HISA's anti-doping and medication control program. *See* Exhibit 1.[2]

**Hawthorne's Termination of Tuma's Employment**

On July 11, 2023, nearly four months after Tuma sent her March 20, 2023 email, Hawthorne defendant John Walsh notified Tuma that her employment as a Hawthorne veterinarian was terminated as part of a cost-cutting measure. ECF 39 ¶ 198. Tuma says this was a pretext, *id.*,

---

[1] Because Tuma's whistleblower email is central to her allegations of wrongful termination, it is subject to judicial notice even though she did not attach it to her complaint. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (affirming motion to dismiss based in part on documents referenced in the complaint and central to its allegations).

[2] *See also* ECF 39 ¶ 36 and *https://hisaus.org/about-us#our-mission*; *https://www.hiwu.org/about*. HISA's constitutionality has been challenged under the non-delegation doctrine, resulting a circuit split. *Compare Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 872, 888–89 (5th Cir. 2022) (declaring Horseracing Safety and Integrity Act, which established HISA (the Authority), facially unconstitutional because it gave "a private entity the last word" on federal law); 107 F.4th 415, 421 (5th Cir. 2024) (later holding that HISA's enforcement provisions violate the private nondelegation doctrine); *stay granted*, No. 24A287, 2024 U.S. LEXIS 4417 (U.S. Oct. 28, 2024), *with Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023) (declaring Act constitutional based on the FTC's ultimate oversight role), *cert. denied*, 144 S. Ct. 2679 (June 24, 2024).

and that she was really fired for blowing the whistle on the "activities of the Enterprise" and to stop her from making further disclosures to "federal regulators," who were scheduled to be on-site in the coming days, ¶¶ 193, 199. Tuma admits that Hawthorne was her employer with authority to set her compensation, approve her requests for time off, assign her days she could or could not work, and "hire and/or fire" her, ¶¶ 9, 118–120, but also asserts that the Illinois Racing Board and state veterinarian Folker-Calderon were also her "employers" for purposes of her state-law claims, ¶ 277; *see also* ¶¶ 110, 286, 293.

**Tuma's Complaint**

Tuma filed this action on September 12, 2024. ECF 1. The defendants filed three separate motions to dismiss. ECF 25, 26 (State Defendants), ECF 27, 28 (Hawthorne defendants), and ECF 35 (Hawthorne veterinarian Beth Buechler). Given the choice to respond to those motions or file an amended complaint, *see* ECF 30, Tuma opted to file an amended complaint, ECF 39. As before, the amended complaint is divided between federal RICO claims in Counts 1 through 4 and state-law whistleblower, retaliatory discharge, and conspiracy claims in Counts 5 through 8. Because the amended complaint does not and cannot cure the defects identified in the motions to dismiss, Tuma's RICO claims and her state-law claims against the State Defendants should be dismissed with prejudice.

**Tuma's RICO Claims**

Tuma defines all the defendants except the Illinois Racing Board as "RICO Defendants," ECF 39 ¶ 2, and contends they associated with a RICO "enterprise," implausibly alleged to consist of Hawthorne and its regulator, the Illinois Racing Board, ¶¶ 1, 5, 202. She contends that Hawthorne and the IRB formed the enterprise for the purpose of operating and promoting horse racing in Illinois "in reaction to the decline in wagers placed in races" run at Hawthorne. ¶¶ 3, 5.

She identifies three types of alleged RICO predicate acts: (i) wire fraud in violation of 18 U.S.C. § 1343 by transmitting false information about horses qualified to race, ECF 39 ¶¶ 208–21; (ii) illegal gambling in violation of 18 U.S.C. § 1955 by supposedly running horse races in violation of the Illinois Horse Racing Act, 230 ILCS 5/35, ¶¶ 222–26, and (against the Hawthorne defendants only), by allegedly transmitting false information about wagers and betting odds in violation of Illinois gambling law, 720 ILCS 5/28-1(a)(11), ¶¶ 227–32; and (iii) retaliation (by the Hawthorne defendants and state veterinarian Folker-Calderon) in violation of 18 U.S.C. § 1513(e) by terminating Tuma for blowing the whistle to state and quasi-federal regulators, ¶¶ 233–36. These are discussed in more detail below.

Tuma asserts the "pattern" began "no later than October 2022" and continued "through at least July 2023," ¶ 206, but as discussed below, the complaint's factual allegations are limited to just 16 race days during the 42-day 2022 "fall meeting," ¶¶ 141, 154, 175, and 22 race days during the 68-day 2023 race meeting, ¶¶ 105, 165–66. Tuma does not allege any racketeering activity after Hawthorne terminated her employment on July 11, 2023, ¶ 198.

The amended complaint continues to assert four RICO counts under each substantive provision of 18 U.S.C. § 1962. Count 1 is against the Hawthorne defendants and Buechler, alleging they violated 18 U.S.C. § 1962(a) by paying themselves out of illegal proceeds of the enterprise that was fraudulently obtained from wagers made by bettors across the country. ECF 39 ¶ 237–44. Those defendants address this claim in their separate motions to dismiss.

In Count 2, Tuma contends the Hawthorne and all the individual defendants violated 18 U.S.C. § 1962(c) by operating an association-in-fact enterprise consisting of Hawthorne and the Illinois Racing Board through a pattern of racketeering. ¶¶ 201–36, 245–53.

In Count 3, Tuma claims Hawthorne and the individual defendants violated 18 U.S.C.

§ 1962(b) by "directly and indirectly" acquiring and maintaining an interest in the enterprise (again, supposedly consisting of Hawthorne and its regulator, the Illinois Racing Board) through the alleged pattern of racketeering. ¶¶ 254–64.

In Count 4, Tuma alleges that Hawthorne and the individual defendants violated 18 U.S.C. § 1962(d) by conspiring to violate RICO sections 1962(a), (b), and (c). ¶¶ 265–73.

Each RICO count alleges the same alleged harm to Tuma's "business or property": a deprivation of employment and "emotional distress" with "physical injuries" and "harm to her professional reputation." ¶¶ 243, 252, 263, 272.

**Alleged Wire Fraud**

Tuma asserts that Hawthorne veterinarian Buechler and state veterinarian Folker-Calderon committed wire fraud by using a "Track Manager" program and "HISA Portal" to submit to "state and federal regulators" "false or altered data regarding the qualifications of horses to run in races at Hawthorne." ECF 39 ¶¶ 210–11; *see also* ¶¶ 157, 168. But by improperly lumping Buechler and Folker-Calderon together, the complaint does not specify *any* entries personally made by Folker-Calderon, nor does it provide any facts to plausibly show that Folker-Calderon *knew or believed* any such entries were false, as opposed to a difference of professional opinion, particularly given Tuma's admission that "association" veterinarians like Tuma and Buechler were required to defer to the judgment of Folker-Calderon as the state veterinarian. *See* ¶¶ 115, 153; 11 Ill. Admin. Code § 605.10 (pertaining to state veterinarian role in ensuring horse health); *id.* § 605.20 (requiring attending veterinarian and trainer to report sick or disabled horses to the state veterinarian).

Tuma further claims that State Defendants Folker-Calderon, Eddy, and Kelley committed wire fraud by electronically transmitting "state veterinarian" lists and "steward" lists with supposedly "false information," ¶ 214, but again without saying how and when each individual

was involved or how or why each of them personally knew or believed information in any veterinarian or steward list was false and intended to deceive "bettors and regulators," and without specifying when or how each individual personally used or caused the wires to be used to submit knowingly false information through interstate commerce.

Tuma separately claims that the Hawthorne defendants committed wire fraud by entering false data on their website and online betting platforms and broadcast services. ECF 39 ¶¶ 218–21. She does not make those allegations against any State Defendant.

### Alleged Illegal Gambling

Tuma also predicates her RICO claims on allegations that the "RICO Defendants" operated an "illegal gambling business" in violation of 18 U.S.C. § 1955 by allowing lame horses to run, supposedly in violation of section 5/35 of the Illinois Horse Racing Act pertaining to horse racing that does not comply with the Act, 230 ILCS 5/35, (but without specifying the violation), ECF 39 ¶¶ 222–26; and, against the Hawthorne defendants only, for violating section 5/28-1(a)(11) of the Illinois Criminal Code by allegedly transmitting false information about wagers and betting odds, ¶¶ 227–32.

### Alleged Retaliation in Violation of 15 U.S.C. § 1513(e).

A new feature of the amended complaint is Tuma's assertion that the termination of her employment not only violates Illinois law (*see* Counts 5–7), but also violates the federal anti-retaliation law in 18 U.S.C. § 1513(e). ECF 39 ¶¶ 233–36. As discussed below, this claim founders against state veterinarian Folker-Calderon because the complaint makes clear that Folker-Calderon was not involved in Tuma's firing, which was done by Hawthorne's John Walsh on July 11, 2023, ¶ 198, and because Tuma cannot show she faced retaliation for making any complaints to federal "law enforcement officers" about potential violations of federal law.

**Tuma's State-Law Claims**

For her state-law claims, Tuma seeks damages for essentially the same alleged harm covered by her RICO claims: loss of income, benefits, career opportunities, humiliation, and emotional distress from her alleged retaliatory discharge. *See* ECF 39, ¶¶ 282, 290, 296, 301; *cf.* ¶¶ 243, 252, 263, 272.

Count 5 is against Hawthorne defendants Hawthorne, Miller, and Walsh plus the Illinois Racing Board and state veterinarian Folker-Calderon for alleged retaliation in violation of the Illinois Whistleblower Act, 740 ILCS 174/15, predicated on the implausible notion that in addition to Hawthorne, the Racing Board and Folker-Calderon were also Tuma's "employer." ECF 39 ¶¶ 275, 277. Tuma says her Hawthorne employment was terminated in retaliation for her disclosure to the Racing Board, HISA, and HIWU, and that "the Defendants" were engaged in a scheme to submit false veterinary records and allow sick and lame horses to race at Hawthorne. ¶¶ 279–81.

Count 6 is another Illinois Whistleblower Act claim, this one limited to Hawthorne and the Illinois Racing Board, again with each supposedly acting as her "employer," for retaliation allegedly based on her refusal "to participate in an illegal scheme to submit false veterinary records to state and federal regulators." ¶¶ 283–90. Count 7 is against Hawthorne and the Illinois Racing Board for alleged common law retaliatory discharge, again premised on each being her "employer." ¶¶ 291–96.

Finally, Count 8 is against all the defendants for common law civil conspiracy based on their alleged participation in and agreement to participate in the alleged RICO predicate acts of wire fraud and illegal gambling discussed above, ¶¶ 298–301, even though the complaint alleges that only certain defendants engaged in certain predicate acts, and without asserting that the Illinois Racing Board participated in any of them.

### Legal Standard

Federal Rule of Civil Procedure 12(b)(6) requires an inquiry whether "the facts alleged in a complaint, taken as true, state a claim for relief under the applicable legal standard." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1068 (2020); *see also Neitske v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law"). The court assumes well-pleaded factual allegations are true but "need not accept as true statements of law or unsupported conclusory factual allegations." *Divane v. Nw. Univ.*, 953 F.3d 980, 987 (7th Cir. 2020).

"To survive a Rule 12(b)(6) motion to dismiss, a complaint must (1) describe the claim in sufficient detail to give the defendant fair notice of the claim and grounds on which it rests, and (2) contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019) (cleaned up). This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The Seventh Circuit has also instructed that "under *Iqbal* and *Twombly*, the required level of factual specificity rises with the complexity of the claim." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 887 (7th Cir. 2012) (cleaned up) (citing *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010) and *McCauley v. City of Chicago*, 671 F.3d 611, 616–17 (7th Cir. 2011)); *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803–04 (7th Cir. 2008) (applying rule to RICO claims).

And where, as here, a plaintiff asserts fraud-based claims, her complaint must state with

particularity the circumstances showing the "who, what, when, where, and how" of the alleged fraud. *See*, *e.g.*, *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009) (cleaned up). Likewise, allegations that lump defendants together without specifying the alleged wrongful conduct by each defendant does not satisfy the notice pleading standards under Rules 8 and 9(b). *See*, *e.g.*, *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (affirming dismissal for, among other things, failure to specify wrongful conduct by each defendant).

**Argument**

The Court should dismiss the RICO claims against the individual State Defendants for failure to state a claim and on qualified immunity grounds and should refrain from exercising supplemental jurisdiction over Tuma's state-law claims. If the Court considers the state-law claims, it should dismiss them against the State Defendants on immunity grounds and because they fail to state a claim against any State Defendant.

**I.     Tuma Fails To State a Plausible RICO Claim Against Any State Defendant.**

    **A.  Tuma's RICO claims for damages from wrongful termination of her employment must be dismissed because they were not caused "by reason of" a RICO violation.**

Each of Tuma's RICO claims fails at the outset because her alleged harm—from alleged wrongful termination of her employment—does not qualify as an injury to her business or property "by reason of a violation of [RICO] section 1962." 18 U.S.C. § 1964(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 493–99 (1985). A RICO plaintiff must establish both an "injury in fact" (for standing) plus an injury directly caused "by reason of" the alleged RICO violation (to establish proximate cause). *Holmes v. Securities Investor Protection Corp.*, 403 U.S. 258, 268–69 (1992) (limiting standing to those directly injured by the RICO violation); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006) (confirming that the alleged *RICO violation* must lead

10

directly to the plaintiff's injuries).

Although Tuma complains generally about the "RICO Defendants'" alleged scheme to defraud bettors and increase the betting "handle" at Hawthorne, *e.g.*, ECF 39 ¶¶ 5, 96, 130, she does not allege any injury from any alleged acts of wire fraud or illegal gambling purportedly directed toward the betting public. The only direct injury she claims stems from Hawthorne's termination of her Hawthorne employment. ¶¶ 243, 252, 263, 272, 282, 290, 296, 301.

In *Beck v. Prupis*, the Supreme Court held that a whistleblower who was wrongfully terminated for reporting RICO misconduct and for refusing to participate in the conspiracy did not have standing to pursue a RICO claim because the overt act in furtherance of the conspiracy— the wrongful termination—was not a RICO predicate act. 529 U.S. 494, 505 (2000). Although the need to show injury from a RICO predicate act still stands, the *Beck* holding must now be viewed in light of the passage of the Sarbanes-Oxley Act, which added subsection (e) to the predicate acts listed in 18 U.S.C. § 1513 to create a federal offense for knowingly retaliating against a person (including by taking harmful action against that person's employment or livelihood) for providing truthful information "*to a law enforcement officer*" relating to the commission or possible commission of a "*Federal offense*." 18 U.S.C. § 1513(e) (emphasis added). *See* Pub. L. No. 107-204, § 1107, 116 Stat. 745, 802–03. An example of this is shown in *DeGuelle v. Camilli*, 664 F.3d 192, 200–202 (7th Cir. 2011), where the plaintiff faced retaliation after reporting potential tax fraud to federal law enforcement agencies.[3] Tuma's alleged retaliation here does not come within 18 U.S.C. § 1513(e) because her complaint does not allege retaliation

---

[3] In *DeGuelle*, the court reversed a dismissal based on the "relatedness" prong of the pattern element (ruling that the alleged retaliation was sufficiently related to the underlying tax fraud scheme), assuming (without deciding) that the alleged retaliation was based on complaints to a "law enforcement officer." 664 F.3d at 195, 200–202.

based on any complaint by her to a "law enforcement officer" about a possible "Federal offense."

First, Tuma does not and cannot plausibly show she made any report to a "law enforcement officer." The U.S. Code defines "law enforcement officer" as an "officer or employee of the Federal Government" or a person authorized to act on its behalf who is also either "(A) authorized under law to engage in or supervise the prevention, detection, investigation, or prosecution of an *offense*; or (B) serving as a probation officer or pretrial services officer under this title." 18 U.S.C. § 1515(a)(4) (emphasis added). The Supreme Court has interpreted "any law-enforcement officer or law-enforcement agency" as limited to those who make arrests under federal law. *See Gallardo v. Marstiller*, 596 U.S. 420, 445 (2022) (Sotomayor, J., dissenting, and citing *United States v. Alvarez-Sanchez*, 411 U.S. 350, 356–58 (1994)).[4] Likewise, the Illinois General Assembly has defined "law enforcement agency" in several statutes as a unit of government vested by law to maintain public order and enforce criminal law or ordinances.[5]

Tuma does not identify a complaint to any federal law enforcement officer authorized to prevent a federal offense. Instead, she directed her complaints to HISA's Dr. Jennifer Durenberger; HIWU's "Chief of Science," Dr. Mary Scollay; and four officials from the Illinois

---

[4] Consistent with this Supreme Court precedent, a "law enforcement officer" in the federal context is usually someone from the FBI. *See, e.g.*, *Sciarrone v. Amrich*, No. 19-cv-4584, 2020 U.S. Dist. LEXIS 97258 at *11 (N.D. Ill. June 3, 2020). In *El Omari v. Buchanan*, No. 20 Civ. 2601, 2021 U.S. Dist. LEXIS 236933 at *16 (S.D.N.Y. Dec. 10, 2021), the court rejected a claim that cooperation with the CIA qualified as cooperation with a "law enforcement officer" within the meaning of 18 U.S.C.§ 1513(e) because the CIA lacks law enforcement powers or internal security functions.

[5] *See, e.g.*, 50 ILCS 705/2 (Illinois Police Training Act: "law enforcement agency" means "any entity with statutory police powers and the ability to employ individuals authorized to make arrests"); 50 ILCS 712/5 (Law Enforcement Officer Bulletproof Vest Act: "law enforcement agency" includes "an agency of this State or unit of local government which is vested by law or ordinance with the duty to maintain public order and to enforce criminal laws or ordinances"); 725 ILCS 5/107-4 (Code of Criminal Procedure of 1963: "law enforcement agency" includes "a municipal police department or county sheriffs office of this State"); 725 ILCS 167/5 (Freedom from Drone Surveillance Act, the term "law enforcement agency" includes "any agency of this State or a political subdivision of this State which is vested by law with the duty to maintain public order and to enforce criminal laws").

Racing Board, including state veterinarian Folker-Calderon. ECF 39, ¶¶ 150, 161, 173–78 & Ex. 1. The amended complaint provides no plausible basis to suggest that any of these individuals was a "law enforcement officer" authorized to make arrests under federal law or to prevent or investigate a federal *offense*.

As discussed above, HISA is a private nonprofit corporation that operates under the auspices of the Federal Trade Commission for the purpose of developing and implementing an anti-doping and medication control and racetrack safety program for "covered horses." 15 U.S.C. § 3052(a). HISA's "enforcement" authority is limited to investigating potential rule violations, internal adjudications, and civil lawsuits, while the FTC retains "oversight and control" of its enforcement activities. *Oklahoma*, 62 F.4th at 231; *cf. Nat'l Horsemen's*, 107 F.4th at 433 (noting that the FTC's oversight over enforcement comes "only after the enforcement process is over and done with" and holding that such oversight is legally insufficient).

HIWU officials likewise do not qualify as a "law enforcement officer." HIWU is not mentioned in the Horseracing Safety and Integrity Act, 15 U.S.C. § 3052. HIWU says it was established in 2022 by Drug Free Sport International (a private entity in the anti-doping industry), to administer the rules and enforce HISA's anti-doping and medication control program. ECF 39 ¶ 36.[6] Whatever anti-doping rules HIWU may profess to "enforce," Tuma's complaint does not allege any violation of anti-doping rules and provides no basis to conclude that HIWU or any of its officials qualify as a "law enforcement officer."

Likewise, no one from the Illinois Racing Board who received Tuma's March 20, 2023

---

[6] *See* https://www.hiwu.org/about; https://www.drugfreesport.com/about-us/. The Horseracing Integrity and Safety Act allows HISA (the Authority) to delegate development and enforcement of doping and medication rules to the private non-profit U.S. Anti-Doping Agency or other comparable entity. 15 U.S.C. § 3054(e)(1)(A),(B). *See also* ECF 39 ¶ 36.

email qualifies as a federal law enforcement officer. The Illinois Racing Board was established by the Illinois Horse Racing Act of 1975, 230 ILCS 5/2, to administer that Act, including by issuing licenses and conducting administrative hearings, *id*. §§ 14a & 15. The Act expressly provides that "[t][he Illinois State Police shall enforce the racing statutes of the State and provide investigative services during all horse racing meetings conducted in this State," *id*. § 34, in cooperation with the Attorney General, county state's attorneys, and the Governor, *id*. § 45. Tuma does not claim to have raised any complaint or concern with the Illinois State Police or any other official authorized to maintain public order or enforce criminal laws.

Tuma also does not allege that she raised with any law enforcement officer the "commission or possible commission of a Federal offense." 18 U.S.C. § 1513(e). The federal criminal code vests federal district courts with jurisdiction over "all offenses against the laws of the United States." 18 U.S.C. § 3231. Tuma's whistleblower email did not raise any potential federal offense listed in the federal criminal code. Instead, it expressed "concerns" about three "broad infringements/potential violations": (1) alleged modifications of equine medical records without the knowledge or consent of the veterinarian establishing the record (Tuma); (2) alleged "inappropriate/fraudulent transactions" between trainers and an unnamed "Regulatory Veterinarian"; and (3) an alleged "[f]ailure to comply with standard operating protocol and procedures." ECF 39 ¶ 174; *see also* Ex. 1.

In short, neither Tuma's whistleblower email nor her amended complaint contains any facts to plausibly show that she was trying to alert a federal "law enforcement officer" of any potential "Federal offense," and each of Tuma's RICO claims must be dismissed because she does not plausibly allege that her claimed injury from the alleged wrongful termination of her employment was "by reason of" a RICO violation instead of from alleged violations of Illinois law.

14

**B. Tuma's alleged personal injuries are not "injury to business or property" under section 1964(c).**

Tuma continues her overreach by seeking to use RICO to recover damages for "physical injuries" and "emotional distress," in addition to her loss of employment and related compensation, resulting from the alleged retaliation against her by "the RICO Defendants," ECF 39 ¶¶ 243, 252, 263, 272. In seeking this relief, Tuma and her counsel disregard well established law confirming that "physical injuries" and "emotional distress" do not qualify as injuries to "business or property" compensable under RICO. *See*, *e.g.*, *Price v. Vill. of Homewood*, No. 24-1896, 2024 U.S. App. LEXIS 26086, at *4 (7th Cir. Oct. 16, 2024) (affirming dismissal of RICO claim in part because claimed emotional distress is not compensable under RICO); *Ryder v. Hyles*, 27 F.4th 1253, 1257 (7th Cir. 2022) (confirming that personal injuries are not compensable under RICO).  Her request for damages should be stricken and dismissed.[7]

**C. Tuma does not plausibly allege that any State Defendant committed a "pattern" of racketeering activity.**

Tuma's section 1962(c) claim in Count 2, including against the three individual State Defendants (state veterinarian Folker-Calderon, and alleged IRB stewards Eddy and Kelley), also must be dismissed because she does not plausibly allege that any of these individuals committed a "pattern" of racketeering activity.

To satisfy RICO's pattern requirement a plaintiff must plead enough to show the alleged acts of "racketeering activity" (predicate acts) are both related to one another and extend over a

---

[7] In a case currently before the Supreme Court, *Medical Marijuana, Inc. v. Horn*, No. 23-365, the Second Circuit confirmed that personal injuries are not compensable under RICO, while also ruling (and disagreeing with the Sixth Circuit) that a loss of employment could be an injury to a plaintiff's "business" or property even if the loss ultimately derived from an antecedent personal injury. *Horn v. Medical Marijuana, Inc.*, 80 F.4th 130, 142 (2d Cir. 2023). Horn suffered a shoulder injury and used a product to treat his pain, not recognizing that it contained THC. *Id*. at 133. He sued the supplier after his employment was terminated when the THC was discovered during a random drug test. *Id*. 134.

sufficiently long period of time, either through a long-term closed-ended scheme or an open-ended scheme that threatens to continue. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240–41 (1989). The Seventh Circuit applies a multi-factor test to consider whether "continuity" is sufficiently pled, *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986) (considering the number and variety of predicate acts, the length of time over which they were allegedly committed, the number of victims and schemes, and the occurrence of distinct injuries), while recognizing that "the most important element of RICO continuity is its temporal element." *Roger Whitmore's Auto Servs., Inc. v. Lake Cnty.*, 424 F.3d 659, 673 (7th Cir. 2005) (affirming that while the Seventh Circuit does not apply a bright-line test for establishing continuity, an alleged mail fraud scheme lasting "about two years" did not establish a pattern of racketeering).

Tuma does not satisfy the "continuity" element against any of the State Defendants. As discussed above, her RICO claims relate to conduct that allegedly began "no later than October 2022," ECF 39 ¶ 206, occurring on just *16 race days* during Hawthorne's 42-day 2022 "fall meeting," *id.* ¶¶ 154, 175, and on just *22 race days* during Hawthorne's 68-day 2023 meeting, ¶¶ 165–66, culminating with Hawthorne's termination of her employment on July 11, 2023, *id.* ¶¶ 198, 206. Even if the Court gives Tuma credit for alleging misconduct during the entire 42-day fall 2022 meeting and the entire 68-day 2023 meeting, *id.* ¶¶ 141, 154, 165–66, 206, that amounts to 110 days, or approximately 3.6 months.

Tuma alleges one basic scheme during this period related to allowing lame horses to run in certain races to increase the betting handle at Hawthorne. She contends this was carried out through acts of wire fraud and illegal gambling, including by the Hawthorne defendants supposedly disseminating false information to "regulators" and "bettors" to induce wagering on sound horses, *id.* ¶¶ 209, 213, 214, 217, but she identifies just one distinct injury—to herself stemming from

16

Hawthorne's termination of her employment, *id*. ¶¶ 243, 252, 263, 272.

Although neither the Supreme Court nor the Seventh Circuit has established a "bright-line" minimum period required to establish closed-ended continuity, *Roger Whitmore's*, 424 F.3d at 673, the Seventh Circuit has repeatedly held that alleged RICO schemes lasting much longer than what is alleged here are too limited to qualify. *See*, *e.g.*, *id.* (scheme lasting "about two years" too short); *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 341–44 (7th Cir. 2019) (affirming dismissal for failure to plead sufficient closed-ended or open-ended continuity involving scheme that allegedly lasted from 2003 to 2006); *Jennings v. Auto Meter Prods.*, 495 F.3d 466, 474–75 (7th Cir. 2007) (affirming dismissal of RICO claims and noting that alleged scheme's ten-month duration "alone might be enough" to defeat closed-ended continuity); *Vicom, Inc. v. Harbridge Merchant Servs.*, 20 F.3d 771, 782 (7th Cir. 1994) (affirming dismissal of RICO claims based on alleged nine-month scheme based on alleged acts of mail and wire fraud targeting Vicom and possibly other merchants); *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1024 (7th Cir. 1992) (citing multiple cases where RICO schemes lasting more than a year were insufficient to establish a pattern).

We have not located any case finding that alleged predicate acts occurring over the course of 3.6 months (let alone *just 38 days*, *see* ECF 39, ¶¶ 105, 154, 166, 175, 198), satisfies closed-ended continuity. Tuma also does not plausibly allege that any individual State Defendant committed a variety of predicate acts beyond vaguely referenced claims of wire fraud that fail to satisfy Rule 9(b); an undeveloped claim of illegal gambling, supposedly in violation of the Illinois Horse Racing Act without describing how; and, against the Hawthorne defendants and Folker-Calderon, supposed retaliation, even though Folker-Calderon was not Tuma's employer and is not alleged to have participated in Hawthorne's termination of her employment. *See* ¶¶ 208–17, 222–

17

26, and 233–26.

Tuma alleges that state veterinarian Folker-Calderon (along with Hawthorne veterinarian Buechler) supposedly committed wire fraud by using a "Track Manager" program and "HISA Portal" to submit to "state and federal regulators" "false or altered data regarding the qualifications of horses to run in races at Hawthorne." ECF 39 ¶¶ 210–11. But the complaint does not specify what data was "false or altered," does not specify when or how *Folker-Calderon* allegedly entered "false or altered" data, and does not explain how or why Folker-Calderon knew or believed that any entries she may have made in Track Manager or the HISA Portal were false as opposed to a difference of professional opinion.

Tuma also alleges that "Buechler and Calderon" overturned 30 of Tuma's "lame assessments" during 16 race dates in 2022, ¶¶ 154, 157, 175, and 48 of her "lame assessments" during 22 race dates in 2023, ¶¶ 166–68, but here again she does not specify which assessments *Folker-Calderon* allegedly overturned. Tuma also does not specify how Folker-Calderon individually engaged in wire fraud in any circumstance where her assessment of a horse's condition may have differed from Tuma's. And even if the Court were to assume that differing assessments constituted "wire fraud," the alleged differing assessments allegedly occurred, at most, during *16 race dates* in 2022 and *22 race dates* in 2023. Such limited conduct is legally insufficient to establish a closed-ended pattern of racketeering.

Tuma further claims that State Defendants Folker-Calderon, Eddy, and Kelley committed wire fraud by electronically transmitting "state veterinarian" and "steward" lists with supposedly "false information," ¶ 214, but here again the complaint does not specify when each individual State Defendant purportedly did this, does not say what information in any particular state veterinarian or steward list was knowingly "false," does not say how or when any State Defendant

18

used the interstate wires to transmit any false veterinarian or steward list, does not provide any facts to plausibly plead any of the required particularity to show that any individual State Defendant knew or believed the information contained in any particular veterinarian or steward list was false, and does not provide any basis to conclude that any of them intended to deceive "bettors and regulators." *Id*.

Consistent with the Seventh Circuit's rulings discussed above, Tuma does not allege that any individual State Defendant committed a closed-ended pattern of racketeering.

Tuma also does not allege that any State Defendant engaged in an open-ended RICO scheme. While Tuma says the alleged scheme continued to "at least July 2023," ¶ 206, she does not identify any conduct by any State Defendant after Hawthorne terminated her employment on July 11, 2023. Tuma does not plead any facts to plausibly show that any individual State Defendant regularly commits RICO predicate acts through an ongoing association with a distinct criminal enterprise that exists for criminal purposes. *H.J. Inc.*, 492 U.S. at 242–43; *Menzies*, 943 F.3d at 341–44 (affirming dismissal for failure to plead sufficient closed-ended or open-ended continuity); *Vicom*, 20 F.3d at 782–83 (affirming dismissal for lack of alleged facts showing a "specific threat of repetition"). Tuma's failure to identify any predicate acts continuing after the termination of her employment defeats any notion of open-ended continuity, *Menzies*, 943 F.3d at 343–44.

**D. Tuma does not allege that any State Defendant operated an "enterprise" distinct from their own business activities.**

Tuma's section 1962(c) claim also runs afoul of her need to plausibly allege how each individual State Defendant operated or managed a distinct RICO "enterprise." 18 U.S.C. § 1961(4). To be sure, a group of individuals and entities can constitute an association-in-fact enterprise—provided they share a common purpose, relationship, and "longevity sufficient to

permit those associates to pursue *the enterprise's purposes*." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (emphasis added). But because section 1962(c) makes it unlawful for a "person" to "conduct or participate . . . in the conduct" of the affairs of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(c), a plaintiff suing under section 1962(c) must identify an enterprise *that is distinct from* the RICO "persons" who allegedly operate it, and must show they conduct the *enterprise's* affairs, not merely their own. *Reves v. Ernst & Young*, 507 U.S. 170, 178–79 (1993); *United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853–54 (7th Cir. 2013).

Tuma first whiffs on this element by alleging, implausibly, that the enterprise consists of Hawthorne and its regulator, the Illinois Racing Board, which supposedly formed to address the decline in wagering revenue at Hawthorne. ECF 39 ¶¶ 1, 3, 5, 202. Even if the Court accepts that the Racing Board and Hawthorne share a common purpose of promoting horse racing in Illinois, Tuma alleges no facts to plausibly support her bald assertion that Hawthorne and its state regulator formed an   enterprise that is distinct from their own operations. That would make a RICO enterprise out of any group of regulated entities and their regulators.

Similarly, Tuma fails to show that any State Defendant "conducted or participated in the conduct of the enterprise's affairs, not just their own affairs." *Reves*, 507 U.S. at 185 (cleaned up); *Walgreen*, 719 F.3d at 854. In *Walgreen*, the Seventh Circuit affirmed a dismissal on precisely this ground. Even accepting that Walgreens, its generic drug supplier Par Pharmaceutical, and their respective management personnel formed an "enterprise" with the common purpose of profiting from illegally substituting Par's more expensive dosage forms of drugs in place of cheaper alternatives, *id*. at 854, the Seventh Circuit rejected the notion that the defendants did anything other than operate their own respective affairs and pursue their own individual self-interest. *Id*. In

20

affirming the dismissal of the RICO claims, the court held that the "activities the complaint describes are entirely consistent with Walgreens and Par each going about its own business, with Par manufacturing generic drugs and marketing its products to pharmacies, and Walgreens purchasing drugs and filing prescriptions." *Id*. at 855.

The Seventh Circuit's holding in *Walgreen* controls here. Tuma's allegations are entirely consistent with (i) Hawthorne and its personnel conducting their ordinary duties associated with operating a horse race track; (ii) Buechler performing her ordinary duties as a Hawthorne veterinarian, including by reviewing Tuma's proposed scratches and performing duties as instructed by Folker-Calderon in her administrative role as the state veterinarian, ECF 39 ¶¶ 16, 69, 77, 81, 153; (iii) Folker-Calderon performing her ordinary administrative duties as the state veterinarian, including by resolving any disputes between Tuma and Buechler related to horse health, *id*. ¶¶ 15, 69, 73–76, 81, 115, 153 and 11 Ill. Admin. Code §§ 605.20 and 605.30; and (iv) Eddy and Kelley performing their ordinary administrative duties as stewards by acting as the eyes and ears of the Illinois Racing Board and by generating steward lists of horses ineligible to run, ¶¶ 18–19, 74(a), 214 and 11 Ill. Admin. Code § 1402.30(a); *see also* § 1402.50 (steward control over all other officials and others involved in race meeting), § 1402.60 (authority to settle all racing questions), § 1402.165 (pertaining to steward lists). As in *Walgreen*, even if the Court accepts for purposes of this motion that any defendant engaged in illegal conduct, the complaint does not plausibly show the conduct was to operate a distinct enterprise consisting of Hawthorne and its regulator, as opposed to performing regular duties on behalf of their respective employers.

For each of the reasons discussed above, the Court should dismiss Tuma's section 1962(c) claim in Count 2 against State Defendants Folker-Calderon, Kelley, and Eddy.

**E. Tuma does not have standing to pursue a section 1962(b) claim, nor does she plausibly show that any individual State Defendant violated section 1962(b) by acquiring an interest in an enterprise through a pattern of racketeering activity.**

RICO's section 1962(b) prohibits the *acquisition or maintenance of an interest in or control* over an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(b). Section 1962(b) (like section 1962(a), against the Hawthorne defendants) has its own standing requirement. Because the essence of a section 1962(b) claim is the wrongful acquisition or maintenance of an interest in or control over an enterprise, a plaintiff bringing a section 1962(b) claim must show an injury that stems directly from the wrongful acquisition or maintenance of control over the enterprise through a pattern of racketeering, as opposed to an injury from the underlying predicate acts. *Xinos v. Kappos*, 270 F. Supp. 2d 1027, 1032 (N.D. Ill. 2003) (citing *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062–63 (2d Cir. 1996), vacated on other grounds, 525 U.S. 128 (1998)). Tuma does not even try to make this showing. *See* ECF 39 ¶¶ 254–64.

Tuma's allegations pertaining to her section 1962(b) claim are the same ones she offers to support her section 1962(c) claim, with nothing added except the conclusion that the "Count III RICO Defendants acquired and maintained interests in and control of the Enterprise through a pattern of racketeering activity, by using funds obtained from the Enterprise, and their pattern of racketeering activity, to pay sums owed to the state and various municipalities to maintain their association license and their horseracing operations." ¶ 258.

These allegations make no sense against any individual State Defendant. The amended complaint does not and cannot plausibly explain how any State Defendant used racketeering activity "to pay sums owed to the state and various municipalities to maintain their association license and their horseracing operations." Tuma's failure to link any predicate acts allegedly committed by any individual State Defendant to the acquisition of control over a distinct enterprise

22

compels the Court to dismiss Tuma's section 1962(b) claim against them. *See Johnson v. Oystacher*, No. 15-cv-2263, 2018 U.S. Dist. LEXIS 180274, at *16–17 (N.D. Ill. Oct. 22, 2018) (dismissing section 1962(b) claim for failure to link acquisition of control over an enterprise to the alleged predicate acts). And because Tuma has now twice failed to plausibly allege how any individual State Defendant engaged in a pattern of racketeering, used a pattern of racketeering to acquire or maintain an interest in a distinct enterprise, and that she suffered harm as a direct result of any such improper acquisition of control over an enterprise, her section 1962(b) claim should be dismissed with prejudice.

### F. Tuma fails to plausibly allege that any State Defendant engaged in a RICO conspiracy in violation of section 1962(d).

Section 1962(d) makes it unlawful to knowingly agree to facilitate conduct that, if completed, would violate section 1962(a), (b), or (c). 18 U.S.C. § 1962(d); *Salinas v. United States*, 522 U.S. 52, 65 (1997); *Domanus v. Locke Lord LLP*, 847 F.3d 459, 479–82 (7th Cir. 2017) (affirming dismissal based on insufficient allegations plausibly showing the defendants knowingly agreed to participate in the alleged RICO conspiracy). This requires the plaintiff to show that each defendant knowingly agreed to facilitate the RICO conduct, and knowingly agreed that a member of the conspiracy would commit at least two predicate acts. *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000); *Domanus*, 847 F.3d at 479–82. The plaintiff also must show an injury from a predicate act of racketeering committed in furtherance of the conspiracy. *Beck*, 529 U.S. at 505.

Tuma's section 1962(d) claim must be dismissed at the outset for the reason discussed in Part I.A above; namely, her injury from alleged wrongful employment termination is not an injury from a RICO predicate act. In addition, for the reasons stated above and in the separate motions to

23

dismiss filed by the Hawthorne defendants and Buechler, Tuma cannot show that the any of the named defendants knowingly agreed to facilitate the RICO conduct, knowingly agreed that any member of the conspiracy would commit at least two predicate acts, and knowingly agreed to facilitate conduct that, if completed, would violate sections 1962(a), (b), or (c). The defendants have already shown that the alleged conduct did not violate any of those sections.

Tuma offers the conclusion that the "Count IV RICO Defendants agreed and conspired to violate" sections (a), (b), and (c) based on the conduct discussed above. ECF 39 ¶ 268. Tuma provides no information to allow the Court to conclude that any individual State Defendant knowingly agreed to facilitate a violation of RICO's sections 1962(a), (b), or (c), or knowingly agreed that they or someone else would commit predicate acts sufficient to sustain any such violation. *Cf. Domanus*, 847 F.3d at 479–82.

As discussed above, the complaint fails to provide any of the required particularity to show that any State Defendant either knowingly submitted or knowingly agreed that a co-conspirator would submit veterinary records that they knew to be false to the Racing Board or anyone else. Tuma likewise does not plausibly show that any State Defendant knowingly supervised or participated in any "illegal horse races." The amended complaint also does not suggest in any way that any State Defendant was involved in "paying themselves out of proceeds of the Enterprise that were fraudulently obtained. . . ." The complaint likewise does not identify how or when any State Defendant knowingly agreed that anyone would defraud bettors and state and federal regulators by withholding information from them that should have been submitted, nor does it in any way show how any State Defendant participated in a scheme to allow anyone to gain control of the alleged enterprise by paying racketeering proceeds the "state and various municipalities."

For all the reasons discussed above, after two tries, Plaintiff still has not satisfied the strict

requirements to state a viable RICO claim. Those claims, particularly against the individual State Defendants, should be dismissed for failure to state a claim and failure to satisfy Rule 9(b).

### G. Tuma's RICO claims against the State Defendants are barred by qualified immunity.

If the Court does not dismiss Tuma's RICO claims against the individual State Defendants for the reasons discussed above, it should dismiss them as barred by qualified immunity.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Even though qualified immunity is an affirmative defense, "the plaintiff carries the burden of showing that [public official] defendants are not immune." *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017). A plaintiff seeking to defeat a defense of qualified immunity must establish two things: first, that she has alleged a violation of a statutory or constitutional right; and second, that the right in question was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Dibble v. Quinn*, 793 F.3d 803, 807–08 (7th Cir. 2015). To be clearly established, a right must be defined so clearly that every reasonable official would have understood that their actions violated that right, with sufficient precedent to place the statutory (or constitutional) issue "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Dibble*, 793 F.3d at 808.

The individual State Defendants are entitled to qualified immunity under the first prong because plaintiff cannot prove that any of them deprived Tuma of a statutory right for the reasons discussed above. The individual State Defendants are also entitled to qualified immunity under the second prong because no clear law existed in 2022 and 2023 putting "beyond debate" that Tuma's complaints to officials from the Illinois Racing Board, HISA, and HIWU qualified as complaints

25

to a "law enforcement officer" about a possible violation of a "Federal offense"—necessary prerequisites for Tuma to recover damages under RICO for her alleged injury from alleged wrongful retaliation. This is especially so given that the legitimacy of HISA (and by extension, HIWU), are the subject of a circuit split not yet resolved by the Supreme Court. *See* n.2 above.

## II.    Tuma's state-law whistleblower, retaliation, and conspiracy claims against the State Defendants are barred by state sovereign immunity and fail to state a viable claim against any State Defendant.

In Counts 5, 6, and 7, Tuma sues various Hawthorne defendants for allegedly terminating her Hawthorne employment in violation of the Illinois Whistleblower Act and the Illinois common law of retaliatory discharge; she adds the Illinois Racing Board and state veterinarian Folker-Calderon as defendants to Count 5 (Whistleblower Act), and the Illinois Racing Board as a defendant to Counts 6 (Whistleblower Act) and Count 7 (common law retaliatory discharge). In Count 8 she sues all the defendants for civil conspiracy under Illinois common law. If the Court considers the state-law claims, it should dismiss them against the State Defendants because they are barred by sovereign immunity and fail to state a claim.

### A.    The Court should decline to exercise supplemental jurisdiction over Tuma's state-law claims.

First, if the Court agrees that Tuma's RICO claims should be dismissed, it should decline to exercise jurisdiction over her remaining state-law claims in Counts 5 through 8. "The general rule, when the federal claims fall out before trial, is that the district court should relinquish jurisdiction over any supplemental (what used to be called 'pendent') state law claims in order to minimize federal judicial intrusion into matters of purely state law." *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015); *see also IWOI, LLC v. Monaco Coach Corp.*, 890 F. Supp. 2d 965, 970–71 (N.D. Ill. 2012) (confirming "it is the well-established law of this circuit that the usual practice

is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial").

Under section 1367(c), a district court may relinquish supplemental jurisdiction over state-law claims if (among other things) the court has "dismissed all claims over which it had original jurisdiction" or the state-law claims "raise a novel or complex issue of State law." 28 U.S.C. § 1367(c). Both grounds apply here. Plaintiff has not stated a RICO claim, and as discussed below, her state-law claims raise unsettled issues of state law. Especially at this early stage in the case, the Court should decline supplemental jurisdiction over plaintiff's state-law claims. *Id.*; *see also Fuqa v. SVOX AG*, 754 F.3d 397, 401 (7th Cir. 2014) (affirming district court's decision to decline supplemental jurisdiction over state-law claims after federal claims dismissed); *Key Outdoor Inc. v. City of Galesburg*, 327 F.3d 549, 550–51 (7th Cir. 2003) (vacating district court's decision to the extent it resolved issues of state law).

### B. Tuma's state-law claims against the State Defendants are barred by the Eleventh Amendment and state sovereign immunity

#### 1. The Illinois Racing Board is immune from suit under the Eleventh Amendment and the State Lawsuit Immunity Act.

If the Court does reach Tuma's state-law claims against the State Defendants, they fail for multiple reasons. To start, the Eleventh Amendment bars all the state-law claims against the Illinois Racing Board. This includes Tuma's Whistleblower Act (Counts 5 and 6), retaliatory discharge (Count 7), and civil conspiracy (Count 8) claims to the extent they name the Illinois Racing Board, a "department of state government." *See LeRoy v. Ill. Racing Bd.*, No. 89-cv-3433, 1992 U.S. Dist. LEXIS 10241, at *21 (N.D. Ill. Jul. 13, 1992).

In the absence of consent, "a suit in which the State or one of its agencies or departments is named as a defendant is proscribed by the Eleventh Amendment," regardless of the relief sought.

27

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *see also id.* at 106 (noting "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law"). Illinois has not consented to suit in federal court with respect to any of the claims that plaintiff asserts against the Racing Board, so those claims must be dismissed. *Id.*; *see also LeRoy*, 1992 U.S. Dist. LEXIS 10241, at *21 (dismissing claims against the Illinois Racing Board on Eleventh Amendment grounds); *Ill. Clean Energy Cmty. Found v. Filan*, No. 03-cv-7596, 2004 U.S. Dist. LEXIS 7615, at *11–12 (N.D. Ill. Apr. 29, 2004) (plaintiffs "may not make an end run around the Eleventh Amendment using supplemental jurisdiction").

Tuma's state-law claims against the Illinois Racing Board in Counts 5 through 8 are separately barred by Illinois sovereign immunity rules, which also apply here. *See Benning v. Bd. of Regents of Regency Universities*, 928 F. 2d 775, 779 (7th Cir. 1991) ( "state rules of immunity are binding in federal court with respect to state causes of action"). The State Lawsuit Immunity Act provides that "[t]he State of Illinois shall not be made a defendant or party in any court," subject to certain exceptions that do not apply here. 745 ILCS 5/1. Illinois' immunity "extends to suits against a State agency or department." *Meyer v. Dep't of Pub. Aid*, 392 Ill. App. 3d 31, 34 (3d Dist. 2009). Federal courts have repeatedly held that the State of Illinois and its agencies and departments are immune from Whistleblower Act claims, as well as retaliatory discharge and other state common law claims, in federal court. *See, e.g.*, *Harris v. Illinois*, 753 F. Supp. 2d 734, 742 (N.D. Ill. 2010) (dismissing Whistleblower Act claim against Illinois Department of Corrections); *Penny v. Lincoln's Challenge Acad.*, No. 17-cv-2232, 2018 U.S. Dist. LEXIS 247950, at *12–15 (C.D. Ill. Aug. 20, 2018) (dismissing Whistleblower Act claim against state agency); *Aguero v. Univ. of Ill.*, No. 16-cv-2298, 2017 U.S. Dist. LEXIS at *21–23 (C.D. Ill. Mar. 30, 2017)

(dismissing Whistleblower Act claim against University of Illinois); *Grant v. Kabaker*, No. 16-cv-3245, 2016 U.S. Dist. LEXIS 182371, at \*7 (C.D. Ill. Oct. 12, 2016) (dismissing Whistleblower Act claim against State of Illinois); *Edwards v. Ill. Dep't of Fin. & Prof'l Regulation*, No. 12-cv-371, 2014 U.S. Dist. LEXIS 40725, at \*25–27 (N.D. Ill. Mar. 27, 2014) (dismissing retaliatory discharge and IIED claims against state agency) (citing *Butler v. Ill. Dep't Transp.*, 533 F. Supp. 2d 821, 826–27 (N.D. Ill. 2008)).

### 2. Tuma's state-law claims against the individual State Defendants are also barred by the State Sovereign Immunity Act.

Plaintiff's state-law claims against the individual State Defendants are barred by the State Lawsuit Immunity Act. The State's sovereign immunity can extend to state employees sued in their individual capacity. *See Mullins v. Evans*, 2021 Ill. App. (1st) 191962, ¶ 67 (2021). Whether an action against a state employee is considered an action against the State itself "does not depend simply on whether the employee was acting within the scope of his employment when he committed the act in question." *Id.* ¶ 68. Rather, the analysis "turns on the *source of the duty* with the breach of which the employee is charged." *Id.* (emphasis in original). If the duty is imposed by virtue of the individual's state employment, as opposed to existing independently of state employment, then sovereign immunity attaches. *Id.* In addition, an action against a state employee will be considered to be against the State, and therefore barred by sovereign immunity, "where a judgment for the plaintiff could operate to control the actions of the State or subject it to liability." *Id.* ¶ 67 (citing *Currie v. Lao*, 148 Ill. 2d 151 (1992), *see also Welch v. Ill. Sup. Ct.*, 322 Ill. App. 3d 345, 351 (3d Dist. 2001)).

The Seventh Circuit and Illinois Supreme Court have clarified that where, as here, the plaintiff seeks damages, allegations that a state employee violated statutory or constitutional law

do not remove the case from the reach of sovereign immunity. *T.S. v. Cnty. of Cook*, 67 F.4th 884, 894 (7th Cir. 2023) (citing *Parmar v. Madigan*, 2018 IL 122265; 106 N.E.2d 1004, 1010 (Ill. 2018)). For claims seeking *injunctive* relief based on ongoing statutory or constitutional violations, the "officer suit" exception to sovereign immunity may apply. *Id.* "But the officer suit exception does not apply in a damages suit." *Id.* (quoting *Parmar* for rule that "a complaint seeking damages . . . does not fall within the officer suit exception to sovereign immunity").[8]

Applying these principles, Tuma's claims for damages against the individual State Defendants are barred by sovereign immunity. Tuma's allegations pertaining to Folker-Calderon, the state veterinarian, relate to her alleged supervisory role over plaintiff and her response to Tuma's work-related complaints. *See* ECF 39, ¶¶ 2, 115, 150–152, 189–91. Tuma alleges that Folker-Calderon improperly relayed her work-related complaints to Tuma's boss, Jim Miller, Hawthorne's Director of Racing. ¶¶ 13, 116–120, 189–92. But any duty that Folker-Calderon had relating to the handing of Tuma's work-related complaints existed by virtue of Folker-Calderdon's state employment, and therefore sovereign immunity applies. *See Mullins*, 2021 Ill. App. (1st) 191962,¶ 68*; see also Cole v. Bd. of Trs. of N. Ill. Univ.*, 38 F. Supp. 925, 933 (N.D. Ill. 2014) (dismissing Whistleblower Act claim challenging decisions of state employee acting in supervisory capacity). Folker-Calderon is also immune because a judgment against her based on how she handled plaintiff's work-related complaints "could control the State's actions or subject

---

[8] As the Seventh Circuit noted in *T.S.*, its prior decision in *Murphy v. Smith*, 844 F.3d 655 (7th Cir. 2016), applied the officer suit exception without discussing the nature of the relief sought. *T.S.*, 67 F.4th at 894–95. This led to significant confusion in the lower courts, with some courts incorrectly applying the officer suit exception to claims against a state employee for damages. *See, e.g.*, *Phelps v. Ill. Dep't of Corr.*, No. 22 C 932, 2023 U.S. Dist. LEXIS 103819, at *26–27 (N.D. Ill. Jun. 15, 2023); *Culp v. Flores*, 454 F. Supp. 3d 764, 770–71 (N.D. Ill. 2020); *Wheeler v. Piazza*, 364 F. Supp. 3d 870, 885–86 (N.D. Ill. 2019). *T.S.* and *Parmar* now make clear that the officer suit exception applies only in cases where the plaintiff is seeking prospective injunctive relief for an ongoing violation of law.

it to liability." *See Wozniak v. Conry*, 288 Ill. App. 3d 129, 133 (4th Dist. 1997) ("The threat of private suits against supervisors for work-related statements about those under their authority clearly would affect the way supervisors communicate, allocate tasks, and make employment decisions."). The state-law claims against Folker-Calderon (Counts 5 and 7, and 8) are barred by sovereign immunity and should be dismissed.

State defendants Thomas Kelley and John Eddy are likewise entitled to state sovereign immunity. Tuma's limited allegations against Kelley and Eddy (added as defendants to her civil conspiracy claim in Count 8) relate to their alleged roles as state stewards in transmitting veterinarian and steward lists. ECF 39 ¶ 214. Because Tuma does not allege that Kelly or Eddy breached any duty owed to her independent of their state employment, *see Mullins*, 2021 Ill. App. (1st) 191962, ¶ 68, her civil conspiracy claim against them is barred by sovereign immunity.

### C. Tuma does not state a viable state-law claim against any State Defendant.

Finally, even apart from the Eleventh Amendment and the State Lawsuit Immunity Act, Tuma has failed to state a viable Whistleblower Act, retaliatory discharge, or civil conspiracy claim against the Illinois Racing Board or any individual State defendant.

### 1. Whistleblower Act (Illinois Racing Board and Folker-Calderon)

Tuma's Whistleblower Act claims (Counts 5 and 6) against the Illinois Racing Board and Folker-Calderon fail for at least three reasons. First, the Act does not apply to state entities, with a limited exception not applicable here. The Act defines "employer" to include:

> an individual, sole proprietorship, partnership, firm, corporation, association, and any other entity that has one or more employees in this State, including a political subdivision of the State; a unit of local government; a school district, combination of school districts, or governing body of a joint agreement of any type formed by two or more school districts; a community college district, State college or university, *or any State agency whose major function is providing educational services*; any authority including a department, division, bureau, board,

31

commission, or other agency of these entities; and any person acting within the scope of his or her authority express or implied on behalf of those entities in dealing with its employees.

740 ILCS 174/5 (emphasis added). This definition encompasses local governmental entities, but does not include state entities, except for state agencies "whose major function is providing educational services." *Id.* The Illinois Racing Board does not fall within this limited exception.

Moreover, no Illinois court has held that the State is subject to the Whistleblower Act. *See Mullins*, 2021 Ill. App. (1st) 191962, ¶ 66 ("We note that it does not appear that any state court has considered whether the State itself is subject to the provisions of the Whistleblower Act."); *see also Harris*, 753 F. Supp. 2d at 742 (stating that although two district courts "concluded, without discussion" that the State is an employer under the Whistleblower Act, no state court has addressed this specific issue). Because the Illinois Racing Board does not fall within the Act's definition of "employer," the Whistleblower Act claims against the Illinois Racing Board (Counts 5 and 6) and Folker-Calderon as an employee of the Illinois Racing Board (Count 5) should be dismissed.

Second, although federal district courts are split on this point, the best reading of the Whistleblower Act is that it "does not impose liability on individual employees." *Patton v. Rhee*, No. 20-cv-76, 2022 U.S. Dist. LEXIS 52031, at *12–13 (N.D. Ill. Mar. 23, 2022) (dismissing Whistleblower Act claims against individual defendants). While the Act's definition of employer includes "any person acting within the scope of his or her authority," 740 ILCS 174/5, this provision is based on similar language in federal antidiscrimination statutes, where the definition of "employer" is "simply a statutory expression of traditional *respondeat superior* liability and imposes no individual liability on agents." *Patton*, 2022 U.S. Dist. LEXIS 52031, at *12; *see also Parker v. Ill. Human Rights Comm'n*, No. 12 C 8275, 2013 U.S. Dist. LEXIS 153881, at *31 (N.D. Ill. Oct. 25, 2013). Because the Whistleblower Act does not permit claims against individuals, the

32

claim against Folker-Calderon (Count 5) fails.

Third, even if the Whistleblower Act is interpreted to allow claims against state agencies and individual state employees, Tuma's claim here fails because she does not plausibly allege that the Illinois Racing Board (or Folker-Calderdon) employed her. The Whistleblower Act prohibits an *employer* from retaliating against an *employee* "because of the employee disclosing or attempting to disclose public corruption or wrongdoing." 740 ILCS 174/20.1. *Cf. Buckner v. Atlantic Plant Maintenance*, 182 Ill. 2d 12, 21 (1998) (stating in connection with a retaliatory discharge claim that "only 'the employer' has the power to hire and fire an employee"). Tuma admits that her employer was Hawthorne Race Course, Inc. ECF 39 ¶¶ 9, 116. She further admits that Hawthorne was authorized to set her compensation, approve her requests for time off, assign her days she could or could not work, and "hire and/or fire" her. ¶¶ 118–120. And she admits that Hawthorne did, in fact, terminate her employment. ¶¶ 197–98.

Plaintiff asserts that Illinois Racing Board was her "co-employer" or "joint employer" because she required a license from the Board to work at any Illinois facilities, and because the Board approves a list of the racing officials who will participate in a meet. *Id.* ¶¶ 110–113. But defendants are aware of no authority holding that a state agency's mere licensing and regulatory oversight function renders it a "co-employer" of an employee who was hired, compensated, and ultimately fired by a separate private company. *See also* 230 ILCS 5/9(j) (stating that the Illinois Racing Board has "no right or power" to determine "who shall be…employees of any licensee, or their salaries"). The Whistleblower Act claims (Counts 5 and 6) fail because neither the Illinois Racing Board nor Folker-Calderdon employed plaintiff.

### 2. Common Law Retaliatory Discharge (Illinois Racing Board)

Tuma's retaliatory discharge claim against the Illinois Racing Board in Count 7 fails for

similar reasons. Illinois common-law retaliatory discharge applies to an employer's wrongful discharge of its employee. This tort exists as a "limited and narrow exception" to the rule that an employer can discharge the employment of an at-will employee with or without cause. *Roberts v. Bd. of Trs. Of Cmty. Coll. Dist. No. 508*, 2019 IL 123594, ¶ 22 (citing cases). To state a claim, the employee must plead facts showing that "(1) the employer discharged the employee, (2) the discharge was in retaliation for the employee's activities, and (3) the discharge violates clearly mandated public policy." *Id*. ¶ 23. As discussed above, the Illinois Racing Board was not Tuma's employer. And in any event, Tuma does not contend that the Illinois Racing Board discharged her. To the contrary, she admits that Hawthorne defendant John Walsh terminated her employment on July 11, 2023. ECF 39, ¶¶ 195–98. Because the Illinois Racing Board neither employed plaintiff nor discharged her, plaintiff's retaliatory discharge claim against the Board must be dismissed.

### 3. Illinois Civil Conspiracy (all defendants)

Finally, if the Court considers Tuma's civil conspiracy claim in Count 8, it should dismiss that claim against the State Defendants because it is founded on the same conduct alleged in connection with her RICO claims and therefore fails for the same reasons discussed above. Tuma fails to allege any facts to plausibly show that either the Illinois Racing Board, Folker-Calderon, Eddy, or Kelley conspired to commit wire fraud or illegal gambling. This is doubly true for the Illinois Racing Board, which Tuma does not accuse of committing any of the alleged RICO predicate acts.

### Conclusion

This case stands as an example of overreach by a plaintiff and counsel who can't resist the lure of treble damages and fees under RICO while also tarring the defendants with accusations of racketeering. That effort fails here, for multiple reasons. The Court should dismiss the RICO

claims and decline to exercise supplemental jurisdiction, leaving Tuma to pursue her state law

claims, against proper defendants, in state court.


Dated: January 31, 2025

R. Douglas Rees
Michael T. Dierkes
Office of the Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
Phone: (312) 814-3498/3672
*richard.rees@ilag.gov*
*michael.dierkes@ilag.gov*

Respectfully submitted,

Defendants ILLINOIS RACING BOARD,
DAWN FOLKER-CALDERON, THOMAS
KELLEY, and JOHN EDDY


By: *R. Douglas Rees*
Deputy Attorney General, Civil Litigation

35