IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTINE TUMA, | ) |
| | ) No. 24-cv-8307 |
| Plaintiff, | ) |
| v. | ) Judge Jeffrey I. Cummings |
| | ) |
| HAWTHORNE RACE COURSE, INC., | ) |
| JIM MILLER, JOHN WALSH, | ) |
| DAVE WHITE, | ) |
| ILLINOIS RACING BOARD, | ) |
| DAWN FOLKER-CALDERON, | ) |
| BETH BUECHLER, | ) |
| THOMAS KELLEY, | ) |
| AND JOHN EDDY, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christine Tuma, a veterinarian previously employed by Hawthorne Race Course, Inc., filed this lawsuit against Hawthorne and others allegedly engaged in a racketeering enterprise (namely, defendants Jim Miller, John Walsh, Dave White, the Illinois Racing Board, Dawn Folker-Calderon, Beth Buechler, Thomas Kelley, and John Eddy), claiming that they worked together to overturn her assessments of race horses as sick or lame in order to increase the number of races and drive up the monetary pay out from wagers, which was then used to pay defendants' salaries and pay sums owed to the state and various municipalities. In plaintiff's amended complaint ("Complaint"), she brings claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961–68, and state law.

Before the Court are the following pending motions to dismiss: Beth Buechler's motion to dismiss pursuant to Federal Rules 12(b)(6) and 9(b), (Dckt. #41); the Illinois Racing Board, Dawn Folker-Calderon, Thomas Kelley, and John Eddy's (the "State Defendants") motion to dismiss pursuant to Federal Rules 9(b), 12(b)(6), and 12(f), and supporting memorandum, (Dckt.

1

##42, 48); and Hawthorne Race Course, Inc. ("Hawthorne"), Jim Miller, John Walsh, and Dave White's (the "Hawthorne Defendants") motion to dismiss pursuant to Federal Rules 12(b)(6) and 12(f), and supporting memorandum, (Dckt. ##44, 47). Among other things, defendants argue that plaintiff fails to allege an injury to her "business or property" that was directly caused by the alleged racketeering activity. For the reasons explained below, the Court agrees. Accordingly, defendants' motions to dismiss, (Dckt. ##41, 42, 44), are granted with respect to plaintiff's federal RICO claims, and the Court relinquishes jurisdiction over plaintiff's state law claims.

I.  **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and the complaint must "permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 679 (2009). When considering a motion to dismiss under Rule 12(b)(6), the Court construes "the complaint in the light most favorable to the [non-moving party] accepting as true all well-pleaded facts and drawing reasonable inferences in [the non-moving party's] favor." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013).

In addition, as the parties agree, Rule 9(b)'s particularity standard applies to fraud-based RICO claims, such as those asserted by plaintiff. A RICO plaintiff must "at a minimum, describe the predicate acts [of fraud] with some specificity and state the time, place, and content of the alleged communications perpetrating the fraud," *Midwest Grinding Co. v. Spitz*, 979 F.2d 1016, 1020 (7th Cir. 1992), and "notify each defendant of his alleged participation in the scheme," *Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 726 (7th Cir. 1998). Rule 9(b)'s

2

specificity requirement requires a plaintiff to allege "a reasonable inference that [the] Defendants' alleged misrepresentations led directly to [the plaintiffs'] employment-related injuries." *Ratfield v. U.S. Drug Testing Lab'ys, Inc.*, 140 F.4th 849, 853 (7th Cir. 2025) (dismissing RICO claim where complaint "does not explain how the employers learned of the misstatements, what exactly they learned, from whom they learned of them, when they learned of them, or whether they would have made the same decisions anyway.").

## II. BACKGROUND

The facts below are drawn from the allegations in Dr. Christine Tuma's ("Tuma" or "plaintiff") Complaint, (Dckt. #39). Tuma's lawsuit accuses all defendants except the Illinois Racing Board ("IRB")[1] of participating in a scheme to race "lame and/or sick horses not legally eligible to race," to increase the amount wagered on races and to defraud the betting public and regulators and "drive up the tax dollars and fees generated." (*Id.* ¶¶43, 127–28). Defendants Hawthorne and the IRB formed an enterprise, through which the remaining defendants "all of whom are either employed by or associated with members of the Enterprise," performed a pattern of criminal activities during the Fall 2022 and Fall 2023 racing seasons. (*Id.* ¶2). Tuma provides four categories of "criminal activities": wire fraud; operating an illegal gambling business in violation of federal law; illegal gambling under Illinois law; and retaliation against Tuma for reporting truthful information relating to the possible commission of a federal offense in violation of 18 U.S.C. §1513(e)).

### A. Tuma's Employment as an Association Veterinarian.

Tuma was jointly employed by the IRB and Hawthorne as an Association Veterinarian. (Compl. ¶¶108, 110). Hawthorne, Miller, and Walsh set Tuma's compensation, her working

---

[1] The IRB is only a defendant in certain of Tuma's state law claims.

3

conditions and rules, and had authority to fire her. (*Id.* ¶¶118, 120). Tuma's job title—"Association Veterinarian"—described one of the three categories of veterinarians present at the racetracks: (a) State/Regulatory Veterinarians;[2] (b) Association Veterinarians; and (c) Attending Veterinarians. (*Id.* ¶67). State/Regulatory and Association Veterinarians both have specified regulatory duties under state and federal law, (*id.* ¶¶69–71), whereas Attending Veterinarians are private contractors paid by horse owners to provide medical care and do not have any regulatory duties, (*id.* ¶68). State/Regulatory Veterinarians have the primary responsibility for "maintaining the safety of racehorses before, during, and after a race." (*Id.* ¶72). Association Veterinarians "perform their duties at the request of and under the auspices of a State/Regulatory Veterinarian." (*Id.* ¶79).

At Hawthorne, Calderon was the State/Regulatory Veterinarian while Tuma and Buechler were the two Association Veterinarians. (*Id.* ¶¶78–79, 153). Calderon, in her capacity as a State/Regulatory Veterinarian and IRB employee, oversaw Tuma's daily veterinary duties. (*Id.* ¶115).

## B. Racing Qualifications for Horses.

All racehorses are required to undergo a pre-race examination conducted by either a State/Regulatory Veterinarian or an Association Veterinarian. (*Id.* ¶83). If deemed unfit to race, either because the horse is assessed as sick or lame (often referred to as "unsound"), the horse is "scratched" and placed on a veterinarian's list, which is then reported to the relevant regulatory agencies. (*Id.* ¶¶88–92). Horses with "lameness are at a higher risk of developing secondary injuries in previously healthy limbs due to altered locomotion." (*Id.* ¶102). Tuma acknowledges

---

[2] Illinois regulations use the terminology "State Veterinarians" whereas federal regulations use "Regulatory Veterinarians," so the Court uses "State/Regulatory Veterinarians" to avoid confusion and because these veterinarians are concurrently regulated under both frameworks.

that there are "a myriad of medical conditions that can lead to lameness, and not all of them directly correlate to a horse's ability to perform well in a particular race." (*Id.* ¶105).

If a State/Regulatory Veterinarian designates a horse as "sick," the horse is scratched and restricted from racing for at least seven days and if a State/Regulatory Veterinarian designates a horse as "lame," the horse is scratched and restricted from racing for at least fourteen days. (*Id.* ¶91). If, for any given race, Hawthorne has fewer than six race-eligible horses—i.e., horses that were not "scratched"—the race cannot collect any wagers from the betting public and Hawthorne can cancel the race or proceed with the race as a "non-wagering exhibition race." (*Id.* at 4 n.3).

### C. The Scheme to Increase the Number of Racing Wagers.

Before each day's races, the two Association Veterinarians, Buechler and Tuma, would each take responsibility for examining half of the horses running that day. (*Id.* ¶132). During the 2022 racing meeting,[3] Calderon authorized Tuma to scratch horses who were unqualified to run and Tuma "routinely did so." (*Id.* ¶135). Tuma would record her assessments in a "Track Manager software" which transmitted horse assessments to the IRB and Horse Integrity and Safety Authority ("HISA"), a "regulatory bod[y] operating under the auspices of the Federal Trade Commission."[4] (*Id.* ¶¶36, 144). Tuma discovered that her assessments were "tampered" with on multiple occasions insofar that her entries changed from "scratch lame" to "racing sound" or "scratch sick." (*Id.* ¶¶146–47). If Buechler deemed a horse lame, Tuma noticed that instead of inputting the assessment herself and triggering the required two-week racing

---

[3] "Each year the IRB approves a series of racing dates. The series of races dates approved by the IRB for a particular racing season are referred to as a 'meeting.'" (Compl. ¶28).

[4] Prior to HISA's establishment, Illinois horse racing was solely regulated by the IRB, the state regulatory body. (Compl. ¶39).

restriction, she would provide horse trainers with the option of submitting the horse as "sick" themselves. (*Id.* ¶¶146, 148). By providing this workaround, horses that were sick or lame could "illegally run prematurely in Illinois horse races," (*id.* ¶149), which would maximize the number of races and thereby increase the number of wagers. According to Tuma, defendants were motivated to conduct this "scheme" due to factors such as the decline of the horse racing industry in Illinois, Hawthorne's deteriorating financial condition, and their desire to fund Hawthorne's new "racino" (racetrack casino). (*Id.* ¶¶26, 240).

In the Fall of 2022, Tuma made a series of complaints to Buechler and Calderon about the "illegal and fraudulent scratching of horses and the misclassification of horses as sick from lame." (*Id.* ¶150). In response, Calderon informed Tuma of a new protocol for future scratches: if an Association Veterinarian believed a horse was lame or sick, she must call the second Association Veterinarian for another opinion.[5] (*Id.* ¶153). If there was still disagreement about the horse's condition, Calderon would decide the horse's assessment in her capacity as State/Regulatory Veterinarian. (*Id.*). Calderon also stripped Tuma of her authority to scratch horses. (*Id.* ¶152).

Tuma alleges that her assessments were overturned a majority of the time during both the 2022 and 2023 racing seasons. During the Fall 2022 meeting, Tuma claims that she assessed at least thirty-four horses as lame but was overturned by Calderon and Buechler in thirty of those instances. (*Id.* ¶¶154–55). During the 2023 meeting, Tuma deemed at least fifty horses as lame, but was overturned by Calderon and Buechler in at least forty-eight of those instances. (*Id.*

---

[5] Because Tuma alleges that she and Buechler were the only Association Veterinarians, Tuma would be required to call Buechler for the secondary opinion in every instance of disagreement.

¶¶166–67). The Complaint is devoid of allegations concerning those horses' race performance or any wagers placed on them.

### D. Tuma Complains About the Horses' Assessments.

On December 4, 2022, Tuma complained to Dr. Mary Scollay, the Chief of Science at the Horse Integrity and Welfare Unit ("HIWU"), an independent agency "operating under HISA," of what she believed to be criminal activity regarding the assessment of the horses. (*Id.* ¶¶36, 161). Dr. Scollay thereafter referred the matter to HISA, (*id.* ¶163), and no action was taken, (*id.* ¶164). On March 20, 2023, Tuma delivered a "comprehensive whistleblower letter" to both the HISA and the IRB, (*id*. ¶173), describing: (a) unauthorized modifications of equine medical records; (b) inappropriate/fraudulent transactions between trainers and veterinarians; and (c) failure to comply with operating protocol and procedure; and "was explicit" that "an investigation must ensue," (*id.* ¶¶173–78). Lastly, on July 6, 2023, Tuma sent the IRB a video of the horse Dastardly Deeds crossing its hind limbs during an examination "to illustrate the egregiousness" of Calderon's decision to let the horse race. (*Id.* ¶¶186–87).

### E. Tuma is Terminated from Her Job as Association Veterinarian.

On July 11, 2023, almost four months after Tuma sent her whistleblower letter, Walsh informed Tuma that she was terminated as a cost cutting measure. (*Id.* ¶198). After Tuma was terminated, Miller texted "various other RICO Defendants" to explain that Tuma's termination was because "it didn't make sense to have two pre-race vets for live racing days." (*Id.* ¶200). Tuma, however, claims that this was "pretext" and that she was actually terminated in retaliation for disclosing the activities of the RICO enterprise and to "ensure that Dr. Tuma could not make any further disclosures regarding the scheme to the federal regulators" because HISA regulators were scheduled to be on site at Hawthorne the following two days. (*Id.* ¶¶193–94).

## III. DISCUSSION

Tuma asserts federal RICO claims and various state law claims. Given that the Court's jurisdiction over Tuma's state law claims hinges on the viability of her federal claims, the Court begins with Tuma's federal claims. For the reasons set forth below, the Court finds that Tuma has failed to allege facts sufficient to plead an injury that was caused by the alleged pattern of racketeering activity. Such an injury is an essential element of her RICO claim. Given this shortcoming, the Court relinquishes jurisdiction over her state-law claims in accordance with Seventh Circuit guidance and denies the Hawthorne Defendants' motion to strike as moot.

### A. Tuma Fails to State a RICO Claim

In her civil RICO claims, Tuma asserts that defendants have violated every section of 18 U.S.C. §1962. In particular, Tuma asserts that Hawthorne, Miller, Walsh, White, Buechler, Calderon, Eddy, and Kelley violated Sections 1962(b), (c) and (d), which provide that it is unlawful to have any interest or control in an enterprise engaged in a pattern of racketeering activity, to be employed or associated with such an enterprise, or to conspire to violate any provision of the RICO statute. Tuma also alleges that Hawthorne, Miller, Walsh, White, and Buechler violated Section 1962(a), which provides that it is unlawful to receive income from a pattern of racketeering activity.

**1. Tuma's Alleged Severe Emotional Distress and Harm to her Professional Reputation Is Not an Injury to Business or Property for the Purposes of a Civil RICO Claim.**

Tuma must first satisfy threshold requirements to bring a civil RICO suit, which is where the Court's inquiry begins—and largely ends. In order to successfully sue under the civil damage provision of RICO, 18 U.S.C. §1964(c), a plaintiff is required to show both that she was (1) injured in her business or property and (2) that the defendants' pattern of racketeering activity

was the factual and proximate cause of her injury. *Holmes v. SIPC*, 503 U.S. 258, 265 (1992); *RWB Servs., LLC v. Hartford Comp. Grp., Inc.*, 539 F.3d 681, 686 (7th Cir. 2008). The Supreme Court has explained that these inquiries are largely intertwined because, "the compensable *injury* necessarily is the *harm* caused by predicate acts sufficiently related to constitute a pattern." *Med. Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 940 (2025) (emphasis in original).

To satisfy the requirement, an "injury to business or property must be concrete, not speculative," and "the damages must be clear and definite." *Viehweg v. Ins. Programs Mgmt. Grp.*, No. 24-1287, 2024 WL 4165078, at *1 (7th Cir. Sept. 12, 2024). The Seventh Circuit has established that, should a plaintiff fail to adequately plead a business or property injury and causation, dismissal is required under Rule 12(b)(6).[6] *Ryder v. Hyles*, 27 F.4th 1253, 1256 (7th Cir. 2022). When evaluating damages, "[t]he general tendency of the law, . . . is not to go beyond the first step." *Holmes*, 503 U.S. at 271 (cleaned up).

Plaintiff claims to have suffered "severe emotional distress resulting in physical injuries and harm to her professional reputation," (Compl. ¶243), in addition to her loss of employment. Such an injury is not compensable under RICO. As the Supreme Court has recently made clear: "§1964(c) does not allow recovery for all harms. Instead, by explicitly permitting recovery for harms to business and property, it implicitly excludes recovery for harm to one's person." *Medical Marijuana*, 145 S.Ct. at 939; *Brown-Austin v. Chambers-Smith*, No. 1:23 CV 478, 2025 WL 2013585, at *5 (S.D.Ohio July 18, 2025) ("Recovery for physical injury or mental suffering

---

[6] The Seventh Circuit previously classified injury and causation as jurisdictional requirements but has since clarified that they are instead "non-jurisdictional element[s] of the cause of action Congress supplied in §1984(c)," and that a plaintiff's failure to adequately plead them results in dismissal under 12(b)(6), not 12(b)(1). *Gress v. Reg'l Transportation Auth.*, No. 17 C 8067, 2024 WL 245185, at *6 (N.D.Ill. Jan. 23, 2024) (cleaned up).

9

is not allowed under civil RICO because it is not an injury to business or property.") (cleaned up).

2. **Even presuming that Tuma's loss of her job was an injury to her business or property for civil RICO purposes, she has failed to allege that this injury was directly caused by the alleged racketeering activity.**

Tuma further alleges an injury based on the termination of her employment at Hawthorne. For purposes of this motion, the Court presumes that the loss of one's employment constitutes an injury to "business or property" for purposes of RICO.[7] Pursuant to the civil RICO statute, "compensable RICO injuries must be caused by the commission of one or more of the predicate acts." *Rylewicz v. Beaton Servs., Ltd.*, 698 F.Supp. 1391, 1395 (N.D.Ill. 1988), *aff'd*, 888 F.2d 1175 (7th Cir. 1989). Tuma alleges a variety of predicate acts committed by defendants: (a) wire fraud in violation of 18 U.S.C. §1955; (b) operating an illegal gambling business in violation of federal law, 18 U.S.C. §1955; (c) illegal gambling in violation of Illinois law, 720 ILCS 5/28-1; and (d) retaliation in violation of 18 U.S.C. §1513(e). (Compl. ¶¶204, 208–36). As explained below, Tuma has failed to sufficiently allege a connection between any of the alleged predicate acts and her termination.

i. **Three out of the four predicate acts have no connection with Tuma's injury.**

Three out of the four alleged predicate acts have nothing to do with Tuma's termination. Plaintiff appears to implicitly agree as her Complaint states that the RICO defendants committed wire fraud "when they agreed to and engaged in a scheme *to defraud bettors and regulators*" and to "induce bettors to wager on [the race-ineligible] horses, thereby *depriving the bettors* of their money and increasing the funds obtained by the Enterprise." (*Id.* ¶¶209, 213, 214, 217, 221)

---

[7] The Supreme Court expressly declined to reach the question of whether the loss of employment constituted an injury to "business or property" in the *Medical Marijuana* case. *Medical Marijuana*, 145 S.Ct. at 938.

10

(emphasis added). The wire fraud as alleged was therefore aimed at defrauding bettors and regulators, not Tuma. The same goes for the predicate acts of operating an illegal gambling business in violation of federal law and illegal gambling in violation of state law, both of which are premised on the same actions as those described in relation to the wire fraud allegations. (*See id.* ¶¶222–32). Tuma fails to establish that these predicate acts directly caused her firing.

The Court's conclusion is not a close call. The Supreme Court has repeatedly emphasized the importance of a direct relation between the injury asserted and the conduct alleged. In *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), the Supreme Court declined to recognize a RICO cause of action where the plaintiff accused one of its competitors of conducting a scheme to underpay taxes to New York State, claiming that it thereby had the competitive advantage to lower its prices and cause harm to the plaintiff's business. The Court found that the plaintiff's alleged harm (defendant offering lower prices) was "entirely distinct" from the alleged RICO violation (defrauding the State of New York). *Id.* at 458. The direct victim of the alleged scheme was the State of New York, who lost tax revenue and could vindicate its own claims. *Id.* at 456–58.

The same is true here where the defendants' alleged scheme targeted the betting public and regulators, rather than Tuma. While Tuma claims her loss of employment is related to the scheme, any relation is far too attenuated. This conclusion is bolstered by one of the motivating principles behind RICO's directness requirement, which considers the court's attempt to ascertain damages. *Holmes*, 503 U.S. at 269. "[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Id.* Tuma alleges her termination was in retaliation for reporting the RICO activities and to prevent her from further impeding them. (Compl. ¶199).

11

However, Tuma also alleges that Hawthorne was strapped for cash due to the decline in horse racing popularity over the past several decades, and as a result, had difficulty paying fees and monies owed. (*Id.* ¶¶58–63). Walsh told Tuma her termination was a cost-cutting measure and texted other defendants as such. (*Id.* ¶¶198, 200). Tuma has thus doomed her Complaint by alleging an "obvious alternative explanation" for her termination. *See Wertymer v. Walmart, Inc.*, No. 24-2001, 2025 WL 1802402, at *4 (7th Cir. July 1, 2025). While Tuma claims her termination was due to retaliation, "it is as likely as not, and perhaps more so," *id.* at *7, that her termination resulted from Hawthorne's efforts to cut costs. (*See* Compl. ¶198 (Tuma "was informed that she had been terminated based on the pretext that her termination was a cost cutting measure.")). Her injury is "mere conjecture and speculation," *Wertymer*, 2025 WL 1802402, at *9, where her loss of employment "could have resulted from factors other than petitioners' alleged acts of fraud," *see Anza*, 547 U.S. at 459.

In *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010), the Supreme Court further reiterated the importance of proximate causation in a RICO suit. There, the Court rejected the City of New York's attempt to sue an out-of-state online cigarette seller that failed to submit forms listing New York customers, preventing New York City from identifying which customers might have failed to pay taxes owed on their purchases. *Id.* The Supreme Court held that the asserted injury, lost tax revenue, was caused by the New York City citizens' failure to pay taxes, rather than the cigarette seller's failure to submit a list of customers, foreclosing any RICO recovery against the cigarette seller. *Id.* at 10–11. "Allowing suits by those injured only indirectly would open the door to 'massive and complex damages litigation[, which would] not only burde[n] the courts, but [would] also undermin[e] the effectiveness of treble-damages

12

suits.'" *Holmes*, 503 U.S. at 274, (1992), *quoting Assoc. Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 545 (1983).

Furthermore, the Court cannot ascertain any group's ascertainable damages here. The Complaint is devoid of information relating to whether (1) people actually placed wagers on the supposedly ineligible horses; (2) the ineligible horses' performance; or (3) the amount of money wagered and lost. As it stands, Tuma merely alleges in a conclusory fashion that the defendants' conduct of promoting sick horses to race "goes well beyond mere disagreements with [her] professional opinions," and without any support, this does not create an injury. (*See* Dckt. #49 at 10).

To this point, Tuma provides two examples of horses she assessed as lame, but that nonetheless raced. (*Id.* ¶¶105(a)–(b)). The horses (Imagine Gold and Dastardly Deeds) finished second and third in their respective races despite Tuma's "lame" assessment. (*Id.*). Tuma likens the horses' positive performance to professional athletes "playing through the pain," such as Peyton Manning's performance during the Denver Bronco's 2016 Super Bowl win despite neck issues that ultimately required surgery, and Tiger Woods' 2008 U.S. Open win despite a torn ACL and leg stress fractures, among others. (*Id.* ¶¶106(a),(e)). However, these examples undercut Tuma's Complaint: anyone who bet on the Broncos in the 2016 Superbowl or on Tiger Woods in the 2008 U.S. Open would have *won* money and *not* lost money. Moreover, if the Court takes as true – as Tuma alleges – that lame horses such as Imagine Gold and Dastardly Deeds may nonetheless perform well enough to place or show,[8] then it must logically conclude that purportedly "defrauded" bettors may win money despite placing wagers on ineligible horses.

---

[8] The Court notes that it "is not required to ignore facts alleged in the complaint that undermine the plaintiff's claim." *Slaney v. The Int'l Amateur Athletic Federation*, 244 F.3d 580, 597 (7th Cir. 2001).

13

In any event, even if bets on ineligible horses invariably led to losses, such damages would be inflicted upon the immediate victims (the bettors), and not Tuma.

> Time and again, we have reiterated that §1964(c)'s "by reason of" language demands "some direct relation between the injury asserted and the injurious conduct alleged." The key word is "direct"; foreseeability does not cut it. Rather, whenever the plaintiff's theory of causation requires moving "well beyond the first step," it "cannot meet RICO's direct relationship requirement."

*Med. Marijuana, Inc.*, 145 S. Ct. at 945 (cleaned up).

In sum: Tuma's damage—her employment termination (and "severe emotional distress resulting in physical injuries and harm to her professional reputation," (Compl. ¶243))—does not directly flow from the alleged predicate acts of wire fraud, illegal gambling, and operating an illegal gambling business. She fails to allege that her injury was directly related to the predicate acts. In addition, and as discussed more below, prior to the enactment of the Sarbanes-Oxley Act, interference with one's employment was not considered a racketeering act and "courts denied RICO standing to employees terminated for refusing to cooperate in an alleged racketeering scheme." *DeGuelle v. Camilli*, 664 F.3d 192, 201 (7th Cir. 2011).

### ii. Tuma has failed to properly allege a predicate act premised on retaliation under the Sarbanes-Oxley Act, 18 U.S.C. §1513(e).

The Court next turns to Tuma's remaining predicate act: retaliation under the Sarbanes-Oxley Act, 18 U.S.C. §1513(e). Pursuant to 18 U.S.C. §1513(e), it is a federal offense to knowingly retaliate against anyone, "including interfere[ing] with the lawful employment or livelihood of any person," for providing truthful information "to a law enforcement officer" related to the "commission or possible commission of any Federal offense." Under RICO, violations of Section 1513 may constitute "racketeering activity." 18 U.S.C. §1961(1).

Again, here, Tuma alleges that she complained of defendants' RICO activity to Dr. Mary Scollay, Chief of Science at HIWU on December 4, 2022, (Compl. ¶161), who then referred the

14

matter to HISA, (Compl. ¶163). Tuma also delivered a "comprehensive whistleblower letter" letter to both HISA and the IRB on March 20, 2023, (*id.* ¶173), describing: (a) unauthorized modifications to horses' medical records; (b) inappropriate/fraudulent transactions between trainers and veterinarians; and (c) failure to comply with operating protocol and procedure; and "was explicit" that "an investigation must ensue," (*id.* ¶¶173–78).

As explained by the Seventh Circuit, "[r]etaliatory acts are inherently connected to the underlying wrongdoing exposed by the whistleblower. Although there may not be the same victims or results, in most cases retaliatory acts and the underlying scheme 'are interrelated by distinguishing characteristics and are not isolated events.'" *DeGuelle*, 664 F.3d at 201, *quoting H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989). As discussed above, the three other predicate acts are insufficient to allege a RICO claim with regard to Tuma. Even assuming the acts could allege racketeering activity regarding other victims—an issue the Court does not decide—Tuma's RICO claim still fails, because she cannot meet Section 1513(e)'s statutory requirements. Section 1513(e) requires that Tuma's complaints be made to a "law enforcement officer." A "law enforcement officer," for purposes of the statute, means "an officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant – (A) authorized under law to engage in or supervise the prevention, detection, investigation, or prosecution of an offense; or (B) serving as a probation or pretrial services officer under this title." 18 U.S.C. §1515(a)(4).

Tuma argues that HISA qualifies as a law enforcement agency because it is authorized to ensure compliance with the Horseracing Integrity and Safety Act, 15 U.S.C. §3502, *et seq.* (Dckt. #49 at 13). Defendants disagree and argue that HISA merely assists the FTC in its

15

enforcement of the Horseracing Integrity and Safety Act. (Dckt. #53 at 9–10). The Court agrees that Tuma's letter to HISA and her complaint to Dr. Scollay at HIWU do not constitute communications "to a law enforcement officer" for the purposes of establishing a RICO predicate act.

HISA and HIWU (operating under HISA), are not government bodies but rather private organizations operating under the FTC.[9] As private entities, they do not constitute a "law enforcement officer" for purposes of Section 1513(e).[10] HISA was incorporated as a nonprofit and recognized as a "private, independent, self-regulatory, nonprofit corporation. . . for purposes of developing and implementing a horseracing anti-doping and medication control program and a racetrack safety program for covered horses, covered persons, and covered horseraces." 15 U.S.C. §3052(a). Notably, HISA was *not* created by the government, but rather was incorporated under Delaware law, and retains permanent authority to appoint its own directors. *Nat'l Horsemen's Benevolent & Protective Ass'n*, 672 F.Supp.3d at 225; 107 F.4th at 438. It is

---

[9] Tuma does not argue that any of her communications to the IRB constitute communications to a law enforcement officer.

[10] Three Circuit courts have similarly found that HISA is a private entity. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 672 F. Supp. 3d 220, 225 (N.D. Tex. 2023), *aff'd in part, rev'd in part*, 107 F.4th 415 (5th Cir. 2024), *cert. granted, judgment vacated sub nom. Texas v. Black*, No. 24-465, 2025 WL 1787677 (U.S. June 30, 2025), and *cert. granted, judgment vacated sub nom. NHBPA v. Hisa, Inc.*, No. 24-472, 2025 WL 1787680 (U.S. June 30, 2025); *Oklahoma v. United States*, 62 F.4th 221, 231 (6th Cir. 2023*), cert. denied*, 144 S. Ct. 2679, 219 L. Ed. 2d 1298 (2024), *reh'g granted and opinion vacated*, No. 23-402, 2025 WL 1787679 (U.S. June 30, 2025), and *cert. granted, judgment vacated*, No. 23-402, 2025 WL 1787679 (U.S. June 30, 2025); *Walmsley v. Fed. Trade Comm'n*, 117 F.4th 1032, 1039 (8th Cir. 2024), *cert. granted, judgment vacated sub nom. Walmsley v. FTC*, No. 24-420, 2025 WL 1789398 (U.S. June 30, 2025).

All three circuit decisions have been vacated and remanded due to the recent decision of *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, No. 24-354, 2025 WL 1773630, at *19 (U.S. June 27, 2025), which held that the Universal Service Administrative Company, a private entity under the FCC, did not violate the private nondelegation doctrine. *Id.* ("an executive agency exercising only executive power, plus (2) a private entity exercising no government power (but merely giving advice) equals (3) a permissible constitutional arrangement."). The *FCC v. Consumers' Rsch.* opinion says nothing to challenge the determination of whether an entity is private or not, nor is that issue in dispute in the now-vacated circuit court cases.

wholly subordinate to the FTC and all "adjudication decisions are not final until the FTC has the opportunity to review them." *Oklahoma*, 62 F.4th at 231. "All told, the Horseracing Authority is subject to [the FTC's] pervasive surveillance and authority, revealing that the Authority operate[s] as an aid to the [FTC], nothing more." *Id.* (cleaned up).

Because Tuma's reports were not to a federal law enforcement officer, she cannot rely on 18 U.S.C. §1513(e) to establish a predicate act. Furthermore, Tuma's Section1962(d) RICO conspiracy claim is based on the same operative facts and must likewise fail. *See Ratfield*, 140 F.4th at 853 ("[B]ecause the RICO claims under 18 U.S.C. §1962(a), (b), and (c) were deficient . . . Plaintiff's RICO conspiracy claims under §1962(d), which are based on the same operative facts, also fail."); *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856–57 (7th Cir. 2013) (same).

Accordingly, Tuma's RICO claims must be dismissed. *See Ryder*, 27 F.4th at 1256.

3. **Because Tuma's RICO claim fails to allege an injury directly related to the defendants' conduct, the Court need not address defendants' remaining arguments concerning her civil RICO claims.**

Because Tuma fails to meet the threshold requirement of alleging an injury directly stemming from the alleged RICO activity, the Court does not need to reach the defendants' remaining arguments related to Tuma's RICO claims. This includes, *inter alia*, the State Defendants' argument that any federal claims against them are barred by qualified immunity, (Dckt. #48 at 32); *Lee v. Harris*, 127 F.4th 666, 676 n.3 (7th Cir. 2025), and Buechler's argument that Tuma failed to plead her involvement, (Dckt. #41).[11]

---

[11] The Hawthorne Defendants' motion to strike portions of Tuma's Complaint, (Dckt. #47 at 32), is moot and is accordingly denied. If plaintiff should choose to amend her Complaint an additional time, she is directed to reevaluate the need for certain portions of her claim in accordance with Rules 8, 9(b), and 11.

## B. The Court Relinquishes Jurisdiction Over Tuma's State Law Claims.

With the federal claims dismissed, only Tuma's state law claims under the Illinois Whistleblower Act, common law retaliatory discharge, and civil conspiracy remain. The Seventh Circuit has embraced a "sensible presumption that if the federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). Accordingly, the Court, in its discretion, declines to exercise supplemental jurisdiction over plaintiffs' pendent state law claims. *See Carlsbad Tech. Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."); *Doxtator v. O'Brien*, 39 F.4th 852, 867 (7th Cir. 2022) ("Without any federal claims over which it had original jurisdiction, the district court's decision not to exercise supplemental jurisdiction over the pendent state law claims was not an abuse of discretion."). Accordingly, Tuma's state law claims against defendants are dismissed without prejudice.

## CONCLUSION

For the reasons set forth above, defendants' motions to dismiss, (Dckt. ##41, 42, 44), are granted as to plaintiffs' federal claims and those claims are dismissed without prejudice. The Court relinquishes jurisdiction over plaintiffs' state law claims and dismisses them without prejudice. The Court grants plaintiff until August 15, 2025 to file a Second Amended

18

Complaint, to the extent she can do so consistent with this Memorandum Opinion and Order and the dictates of Federal Rule of Civil Procedure 11.

**DATE: July 25, 2025**

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　
　　　　　　　　　　　　　　　　　　　　　　　**Jeffrey I. Cummings**
　　　　　　　　　　　　　　　　　　　　　　　**United States District Court Judge**